**SOCIETE DES PRODUITS NESTLE, S.A. Nestle Puerto Rico, Inc., Plaintiffs,**

v.

**CASA HELVETIA, INC., Helen Bette, Ivonne Bette de Sanchez, Frank Bette, Defendants.**

**No. Civ. 91–1103CCC.**

United States District Court, D. Puerto Rico.

Nov. 15, 1991.

César T. Alcover–Acosta, Fiddler, González & Rodríguez, for plaintiffs.

Wilma E. Reverón–Collazo, Acevedo & Reverón, for defendants.

## OPINION AND ORDER

CEREZO, District Judge.

This is an action for trademark infringement and unfair competition filed by Societe Des Produits Nestle, S.A. (Nestlé S.P.N.) registered owner of PERUGINA trademarks for chocolate candy in the United States and Puerto Rico, and its wholly owned subsidiary Nestlé Puerto Rico, Inc. (Nestlé P.R.), the exclusive distributor in Puerto Rico, against Casa Helvetia, Inc. and its officers Helen Bette, Ivonne Bette de Sánchez and Frank Bette. Plaintiffs' chocolates are manufactured in Italy. It is plaintiffs' contention that Casa Helvetia's importation and distribution of PERUGI-NA chocolates from Venezuela infringes on the United States and Puerto Rico registered trademarks and the exclusivity of Nestlé P.R. right of distributorship. The Venezuelan chocolates are genuine PERUGINA candies purchased from Distribuidora Nacional de Alimentos La Universal S.A., Nestlé S.P.N.'s licensee appointed and authorized to produce and distribute in Venezuela candies bearing the various PERUGINA trademarks.

The plaintiffs have alleged federal claims under the Lanham Act, 15 U.S.C. § 1051, *et seq.*, as well as pendent claims under the laws of Puerto Rico. The specific federal claims are delineated in three counts as follows. In Count I, which is characterized as a trademark infringement and is brought pursuant to 15 USC § 1114(1)[1] the plaintiffs allege that:

> 5.3 Defendants have infringed Nestlé S.P.N.'s trademarks in commerce by means of importation, distribution and offer for sale and sale in Puerto Rico of the Venezuelan product, namely, goods materially different in character from the PERUGINA candies. Such acts are likely to cause confusion, mistake and deception among actual and potential consumers of PERUGINA candies.

Under Count II of the amended complaint, which plaintiffs designate as a claim of unfair competition under 15 USC § 1125(a),[2] it is alleged that:

1. Title 15 USC § 1114(1) reads as follows:

   (1) Any person who shall, without the consent of the registrant—

   (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

   (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

   shall be liable in a civil action by the registrant for the remedies hereinafter provided.

   Under subsection (b) of this section, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.

2. Title 15 USC § 1125(a) reads as follows:

   (a) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

   (1) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

6.3 Defendants have used the PERUGINA trademark in commerce in such a manner as to create a likelihood of confusion among customers in Puerto Rico, inducing purchasers to believe that (a) Nestlé P.R. under the authorization of Nestlé S.P.N., is offering, manufacturing and selling the Venezuelan product and that (b) the Venezuelan product is the same as the PERUGINA candies. Defendants' acts have damaged, impaired and diluted the goodwill associated with the PERUGINA trademarks and have damaged the PERUGINA trademarks themselves. Also, defendants' acts have damaged Nestlé P.R.'s business.

6.4 Defendants' acts of false designation, unfair competition and improper use of Nestlé S.P.N.'s trademark in commerce are likely to cause confusion mistake and deception among actual and potential consumers of PERUGINA candies.

Count VI raises a claim under 15 USC § 1124 [3] for importation of a materially different product.

Defendants responded with a counterclaim under Puerto Rico Law 75 of June 24, 1964, 10 LPRA § 278, *et seq.*, for termination of their exclusive dealership contract without just cause.

A consolidated hearing on the preliminary and permanent injunction was held March 18 and 20, 1991. The Court ordered the parties to file simultaneous briefs by April 19, 1991.

Testimony and exhibits of the various chocolate products revealed the following:

Vivian Riera, product manager for marketing at Nestlé P.R., testified that premium chocolate candies, as opposed to mass products, are distributed in selected stores; are refined and sophisticated. She opined that the PERUGINA–Italy is a premium product because of its components, presentation of the package, such as boxes lined with gold or silver trays and sophisticated shapes, allegedly indicators of quality.

In comparing the PERUGINA BACI from Italy with the PERUGINA BACI from Venezuela, Riera stated that there are similarities in color. Both have PERUGINA logo and the same logo type, both have Pegasus symbols and have a picture of the product on the back of the box. The boxes themselves, however, are different; chocolates PERUGINA BACI from Italy are priced at $12.99, while the Venezuelan counterpart sells for $7.50 for the same quantity. The Italian product is described on the box in English and French; the Venezuelan one is inscribed in Spanish and English. The PERUGINA BACI Venezuela product is clearly identified as having been made in Venezuela by the manufacturers mentioned above, while Nestlé S.P.N. is identified as a product of Italy. Other differences pointed out were the fact that PERUGINA BACI Italy's box has a glossy waxed finish with a silver tray which is lacking in the Venezuelan BACI which has a transparent tray.

Riera went on to testify that BACI–Venezuela is chocolate made from domestic beans, while the chocolate in Italian BACI came from Ecuadorian and African beans. The Italian BACI is made from cooked sugar syrup while the Venezuelan BACI use normal crystal sugar. The Italian product has five per cent more milk fat to

(2) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

**3.** Title 15 USC § 1124 reads as follows:
Except as provided in subsection (d) of section 1526 of Title 19, no article of imported merchandise which shall copy or simulate the name of the any domestic manufacture, or manufacturer, or trader, or of any manufacturer or trader located in any foreign country which, by treaty, convention, or law affords similar privileges to citizens of the United States, or which shall copy or simulate a trademark registered in accordance with the provisions of this chapter or shall bear a name or mark calculated to induce the public to believe that the article is manufactured in the United States, or that it is manufactured in any foreign country or locality other than the country or locality in which it is in fact manufactured, shall be admitted to entry at any customhouse of the United States. . . .

prolong shelf life. The Venezuelan BACI uses imported hazelnut while the Italian BACI uses fresh hazelnuts.[4]

The witness gave similar testimony regarding two PERUGINA TRADEMARK chocolate assortments—one trademarked Mitré Confesseur; the other a larger box with similar assortments. In each case similarities and differences in the boxes, wrappings, shapes of the candies were pointed out, emphasizing the "gold," "silver" and "glossy" of the Italian PERUGINA products as opposed to the ordinariness of the Venezuelan PERUGINA. Notwithstanding the facts that the Venezuelan products are genuine PERUGINA products manufactured under authorization from Nestlé S.P.N. and that there was no testimony as to whether or not the Venezuelan products met any required quality standards, the witnesses' testimony on the products, her choice of comparisons and demeanor in testifying left the court with the definite impression that plaintiffs were inferring that the authorized Venezuelan PERUGINA were an inferior chocolate in commonplace packaging.

The Court has closely examined the individual chocolates. Apart from the differences in the boxes, wrappers and trays, the appearance of the individual chocolates, wrapped and unwrapped were almost undistinguishable. The BACI chocolates themselves outside and inside appeared identical. The Italian assorted chocolates did come in a greater variety of shapes than their Venezuelan counterparts.

On July 10, 1991 we asked plaintiffs to file a reply brief addressing Nestlé S.P.N.'s right to protection under the Lanham Act for trademark infringement and Nestlé

P.R.'s standing as what appeared to be a mere distributor. Nestlé S.P.N. met its burden with the appropriate information. Nestlé P.R. cited various cases to support its contention that as an exclusive distributor it may prosecute an action under 15 U.S.C. § 1125(a).

■ Section 1125(a), however, is designed to protect against "false designation of origin, or any false description or representation." Plaintiff's own evidence belies the existence of a cause of action under this section. It is undisputed that the Venezuelan manufacturer is licensed to produce the PERUGINA products. Each such box admitted into evidence is clearly labeled, in both English and Spanish, as being made in Venezuela by Alimentos under a license granted by PERUGINA SPA Italy. The Italian PERUGINA boxes have a similar identification detailing their production in Italy. None of the boxes make any mention of Nestlé SPN or Nestlé PR. Thus, the ultimate consumer would probably have no knowledge of Nestlé's relationship to PERUGINA as a source of the chocolates. In the absence of any false designation of origin or false or misleading description of fact or false or misleading representation of fact, we find that plaintiffs have failed to state a claim under 15 U.S.C. Section 1125(a).[5]

■ Likewise Section 1114(1) presents problems for the plaintiff in pertinent part:

(1) Any person who shall, *without the consent of the registrant*—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation . . .

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and

---

4. The witness did not elaborate on whether the fact of importation negated freshness.

5. The cases cited by plaintiffs to support Nestlé PR standing also support the lack of a claim. *See e.g., Quabaug Rubber Co. v. Fabiano Shoe Co., Inc.,* 567 F.2d 154 (1st Cir.1977) (Shoe manufacturer Fabiano, not an authorized user of the VIBRAM trademark created a mark similar to the VIBRAM one, and continued to advertise that the soles of its boots were VIBRAM); *FRA S.p.A. v. Surg–O–Flex, Inc.,* 415 F.Supp. 421 (S.D.N.Y.1976) (defendant pasted a label of its

trademark Surg–O–Flex over the label of the box of plaintiff's elastic bandages, trademarked SURGIFIX, thus obscuring the true identity of the product); *Norman M. Morris Corp. v. Weinstein,* 466 F.2d 137 (5th Cir.1972) (Importation of Omega watches, on which identifying serial numbers had been drilled off, which because of the alteration were not covered by the factory guarantee, falsely represented the true nature of the guarantee, which was only that given by the importer).

apply such reproduction, counterfeit, copy, or colorable imitation ...

shall be liable in a civil action by the registrant.... (Emphasis added.)

It is uncontested that Alimentos uses the PERUGINA trademarks *with* the consent of Registrant/Nestlé SPN. If Alimentos is violating its license agreement by exporting outside the area defined in a restrictive territorial clause that may create a breach of contract cause of action against Alimentos but does not turn an otherwise genuine PERUGINA product into a counterfeit one or a colorable imitation.

Francisco Cruzado–Medina, merchandise manager from Farmacias Moscoso, testified that he has purchased PERUGINA products from both parties, that he purchased from Casa Helvetia because they offered the chocolates at a better price. He also stated that he did identify the source of either product to those stores when sending them out. On cross-examination he testified that defendant Ivette Bette had told him that the PERUGINA BACI she carried were from Venezuela. Cruz–Medina indicated that he had no knowledge of any complaints about the PERUGINA originating in Venezuela from consumers or any returns.

Defendant Helen Bette testified that she has been selling Venezuelan PERUGINA since a distributor from Venezuela came to Puerto Rico and offered the line of products to her. She had him send her samples and found them comparable to the Italian PERUGINA. She stated that she has never received any complaints about the product she distributes, nor has she had any returns. Ivette Bette testified that it is the store's policy to have its salespeople inform their clients that their PERUGINA products are from Venezuela. She, too, has never received any complaints about the candies nor any returns.

The evidence shows that the defendants have not tried to obscure the source of their product; rather they have been very open and straight forward about the origin of the chocolate. Likewise, there is no evidence of any customer dissatisfaction or rejection.

Plaintiffs' claims under § 1124 are also without merit. The plain language of the statute does not bar importation if the goods are genuine, only if they "copy or simulate" a trademark. *Olympus Corp. v. United States*, 792 F.2d 315 (2nd Cir.1986).

Plaintiffs argue that "Nestlé SPN as trademark owner, may prohibit the importation and sale of 'parallel' or 'grey' goods, [ ] based on the principle of territoriality as set forth in *A. Bourjois v. Katzel*, 260 U.S. 689, 43 S.Ct. 244, 67 L.Ed. 464 (1923)." *Plaintiffs' Post Trial Brief* (docket entry 19) at p. 16. The ratio in *Bourjois*, however has been limited strictly to the facts in that case. *See e.g., Weil Ceramics and Glass, Inc. v. Dash*, 878 F.2d 659 (3rd Cir. 1989); *NEC Electronics v. CAL Circuit Abco*, 810 F.2d 1506 (9th Cir.1987); *Olympus Corp. v. United States*, 792 F.2d 315 (2nd Cir.1986).

The case of *Bourjois, supra*, concerned the import of genuine goods without the consent of the holder of a valid United States trademark. It involved a United States company, Bourjois, that had purchased all the business in the United States, the goodwill and United States trademark rights for "Java" face powder from its French manufacturer. Bourjois had no relationship with the French company. When competitors began to purchase the powder in France and thereafter imported it into the United States in competition with Bourjois, the Supreme Court held that importation of the French product infringed on the domestic holder's rights. Jurisprudence, in its narrowing of the *Bourjois* holding, have focused on the complete independence of Bourjois from the foreign manufacturer. In *Weil Ceramics and Glass, Inc., supra*, the Court found that *Weil*, the United States trademark holder and exclusive distributor of Lladró porcelain, was a wholly owned subsidiary of the sister corporation of the Spanish manufacturer. Stating that even if Weil lost some share of the United States market to the unauthorized importer/distributor, it nonetheless benefitted from the profits it received as part of the corporate entity from which the competitor pur-

chased the goods abroad. As the Court noted, the corporate entity had an obvious self-help mechanism, it could stop parallel importation by ceasing to sell to the competitor abroad, thereby effectively eliminating its United States competition with Weil.

A similar analysis was used in *NEC Electronics, supra,* where the Court found that the American subsidiary of a Japanese computer chip manufacturer failed to state a claim under the Lanham Act where its parent company chose to sell abroad at lower prices to others who brought the merchandise into the United States.

While Sections 1125(a) and 1114(1) have been used to address the unauthorized importation of genuine goods in violation of territorial clauses contained in licensing agreements, the case before us is distinguishable from the facts of such cases. In *Dial Corp. v. Manghnani Inv. Corp.,* 659 F.Supp. 1230 (D.Conn.1987), the Court denied a motion to dismiss finding the American deodorant soap different in several respects: the American product was substantially more effective in providing anti-bacterial protection; the fragrance of the soaps were different, each appealing to the consumer group for which it was produced; the imported bar was smaller; and the imported bar was improperly labeled, lacked FDA approval for use in the United States and was not listed as a drug regulated by the FDA. In *Orig. Appalachian Artworks v. Granada Electronics,* 816 F.2d 68 (2nd Cir.1987), the Court found that Cabbage Patch Kids dolls imported from Spain by Jesmar were materially different from those designed for sale by Coleco in the United States, in that "the foreign language adoption papers and birth certificate, coupled with the United States fulfillment houses' inability or unwillingness to process the Jesmar's adoption papers or mail adoption certificates and birthday cards to Jesmar doll owners, and the concomitant inability of consumers to 'adopt' the dolls" created a very real material difference in the product itself which would result in confusion as to the source and loss applications Artworks and Coleco's goodwill. *Id.* at 73.

In *Osawa & Co. v. B & H Photo,* 589 F.Supp. 1163 (S.D. New York 1984), the Court noted that plaintiffs authorized distribution of Mamiya camera equipment was premised upon a continuing relationship between dealer and customer involving advice, service, and the future purchase of specialized peripheral equipment. Plaintiff offered free warranty repairs performed by its own employer or authorized service representatives who must receive training in the equipment. Defendants, however, while providing none of this support nonetheless traded upon it, advertised the manufacturer's warranty, and placed plaintiffs in the catch–22 of providing warranty service for defendant's goods or suffering damage to the reputation of its marks. The court found that the submission of grey market cameras for warranty repairs, among other things, was significant evidence of consumer confusion.

In each of those cases in which the Lanham Act was used to uphold infringement by a genuine product, the underlying motive was a *material* difference which would cause consumer confusion, dissatisfaction, and irreparable harm to the goodwill of the United States' trademark hold. A "deodorant" soap without reliable antibacterial properties, the novelty of an "adoptable" doll which could not partake in the adoption scheme, and a program of technical support and warranty which, though advertised, was not provided by the grey market competitor, could only lead to consumer confusion in injury to the goodwill of the United States trademark product.

The evidence before us, however, presents a different picture. Defendants' witnesses presented testimony to the fact that the origin of the product is clearly explained. Testimony also supported the absence of any consumer dissatisfaction at both the retail and wholesale levels. Perhaps it is because the subtle differences in the packaging of the product, so heavily relied upon by plaintiff, end up in the trash once the chocolates are consumed. As to the candy itself, it is not convincing that the ultimate consumer is concerned about the country of origin of cocoa beans and

hazelnuts, or the number of different shapes in which the chocolates are made. Moreover, the uncontroverted evidence presented by defendants belies consumer confusion or dissatisfaction. There is no evidence before this Court to support the claim that sale by defendants of the Venezuelan PERUGINA is harming the plaintiff's goodwill,[6] or that Venezuelan PERUGINA is any less a "fine" chocolate than its Italian counterpart imported by the Nestlés.

We, therefore, find that Nestlé P.R. and Nestlés SPN owner of the PERUGINA trademarks fail to state claims against the defendants under the Lanham Act by their distribution of the Venezuelan trademarked chocolates in Puerto Rico. Accordingly, the motions for preliminary and permanent injunction are DENIED and Counts I, II and VI are DISMISSED. Inasmuch as the remaining claims and counterclaims are before us on our pendent jurisdiction, and complete diversity, which would provide an alternative basis for federal jurisdiction, is absent, we DISMISS the remaining claims without prejudice to be brought in the Commonwealth Court.

SO ORDERED.

---

6. We note that defendants, distributors of PERUGINA's chocolates and candies in Puerto Rico for almost thirty years, are probably in a large part the creators of that goodwill.