**SOCIETE DES PRODUITS NESTLE, S.A., et al., Plaintiffs, Appellants,**

v.

**CASA HELVETIA, INC., et al., Defendants, Appellees.**

No. 92–1032.

United States Court of Appeals, First Circuit.

Heard Sept. 16, 1992.

Decided Dec. 29, 1992.

---

David W. Plant, with whom Vincent N. Palladino and Fish & Neave were on brief, for plaintiffs, appellants.

Wilma E. Reveron Collazo, for defendants, appellees.

Before SELYA, Circuit Judge, CAMPBELL, Senior Circuit Judge, and BOUDIN, Circuit Judge.

SELYA, Circuit Judge.

This bittersweet appeal requires us to address the protection that trademark law affords a registrant against the importation and sale of so-called "gray goods," that is, trademarked goods manufactured abroad under a valid license but brought into this country in derogation of arrangements lawfully made by the trademark holder to ensure territorial exclusivity. As we explain below, the scope of protection turns on the degree of difference between the product authorized for the domestic market and the allegedly infringing product. In the case before us, the difference is sufficiently marked that the domestic product warrants protection.[1]

## I. BACKGROUND

PERUGINA chocolates originated in Italy and continue to be manufactured there. They are sold throughout the world and cater to a sophisticated consumer, a refined palate, and an indulgent budget. Societe Des Produits Nestle, S.A. (Nestle S.P.N.) owns the PERUGINA trademark.[2]

For many years, defendant-appellee Casa Helvetia, Inc. was the authorized distributor of PERUGINA chocolates in Puerto Rico. On November 28, 1988, however, Nestle S.P.N. forsook Casa Helvetia and licensed its affiliate, Nestle Puerto Rico, Inc. (Nestle P.R.), as the exclusive Puerto Rican distributor.

At this point, the plot thickened. Nestle S.P.N. had previously licensed an independent company, Distribuidora Nacional de Alimentos La Universal S.A. (Alimentos),

to manufacture and sell chocolates bearing the PERUGINA mark in Venezuela.[3] The Venezuelan sweets differ from the Italian sweets in presentation, variety, composition, and price. In March 1990, without obtaining Nestle S.P.N.'s consent, Casa Helvetia began to purchase the Venezuelan-made chocolates through a middleman, import them into Puerto Rico, and distribute them under the PERUGINA mark.

This maneuver drew a swift response. Charging that Casa Helvetia's marketing of the Venezuelan candies infringed both Nestle S.P.N.'s registered trademark and Nestle P.R.'s right of exclusive distributorship, Nestle S.P.N. and Nestle P.R. (hereinafter collectively "Nestle") sued under the Lanham Trade–Mark Act of 1946, *codified as amended,* 15. U.S.C. §§ 1051–1072, 1091–1096, 1111–1121, 1123–1127 (1988).[4] They claimed that Casa Helvetia's use of the PERUGINA label was "likely to confuse consumers into the mistaken belief that the Venezuelan chocolates are the same as the Italian chocolates and are authorized by Nestle for sale in Puerto Rico." And, they asserted that, because the PERUGINA name in Puerto Rico is associated with Italian-made chocolates, the importation of materially different Venezuelan chocolates threatened to erode "the integrity of the PERUGINA trademarks as symbols of consistent quality and goodwill in Puerto Rico."

The district court consolidated the hearing on preliminary injunction with the hearing on the merits, *see* Fed.R.Civ.P. 65(a)(2), and, after taking testimony, ruled in the

1. We use the term "domestic product" to describe a product that the registrant has authorized for sale in the domestic market and to which the registrant has lawfully accorded territorial exclusivity. We note, however, that the "domestic product" may, as in this case, be manufactured abroad.

2. The PERUGINA trademark includes four marks registered in the United States and Puerto Rico: PERUGINA, PERUGINA with design, PERUGINA and BACI with design, and BACI with design. We subsequently use the name "PERUGINA" to refer to any one or more of the four, singly or in combination.

3. Under the licensing agreement, Alimentos may not sell or distribute the Venezuelan prod-

uct in the United States without written authorization from Nestle S.P.N. Moreover, the licensing agreement states that Alimentos "cannot export the products under the 'trademarks' to [countries outside Venezuela], either directly or indirectly," except via Nestle S.P.N. Insofar as the record reveals, the licensing agreement remains in effect.

4. Nestle's suit originally named three officers of Casa Helvetia as codefendants. One corporate officer, Helen Bette, remains in the case as a defendant and appellee. For ease in reference, we proceed as if Casa Helvetia were the sole party in interest.

defendants' favor. *See Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 777 F.Supp. 161 (D.P.R.1991). It held that the differences between the Italian-made and Venezuelan-made candies did not warrant injunctive relief in the absence of demonstrated consumer dissatisfaction, harm to plaintiffs' good will, or drop-off in product quality. *Id.* at 166–67. This appeal followed.

## II. THE LANHAM TRADE–MARK ACT CLAIMS

We first remark the policies that underlie the Lanham Trade–Mark Act and the implications of those policies for the parallel importation of trademarked goods. We then turn to the three specific statutory provisions which the plaintiffs invoke.

### A. *The Philosophy of the Lanham Trade–Mark Act.*

Two amaranthine principles fuel the Lanham Trade–Mark Act. One aims at protecting consumers. The other focuses on protecting registrants and their assignees. These interlocking principles, in turn, are linked to a concept of territorial exclusivity.

1. *Animating Principles.* Every product is composed of a bundle of special characteristics. The consumer who purchases what he believes is the same product expects to receive those special characteristics on every occasion. Congress enacted the Lanham Trade–Mark Act to realize this expectation with regard to goods bearing a particular trademark. *See* S.Rep. No. 1333, 19th Cong., 2d Sess., *reprinted in* 1946 U.S.Code Cong.Serv. 1274. The Act's prophylaxis operates not only in the more obvious cases, involving the sale of inferior goods in derogation of the registrant's mark, but also in the less obvious cases, involving the sale of goods different from, although not necessarily inferior to, the goods that the customer expected to receive. *See Truck Equip. Serv. Co. v. Fruehauf Corp.*, 536 F.2d 1210, 1216 (8th Cir.) (finding a Lanham Act violation even though plaintiff's and defendant's goods were "of equal quality"), *cert. denied*, 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976); *see also* 1 J. Thomas McCarthy, Trademarks and Unfair Competition § 3:4, at 113 (2d ed. 1984) (explaining that trademark law embodies consumers' expectations of consistent quality "whether that quality is high, low or mediocre"). By guaranteeing consistency, a trademark wards off both consumer confusion and possible deceit.

The system also serves another, equally important, purpose by protecting the trademark owner's goodwill. *See Keds Corp. v. Renee Int'l Trading Corp.*, 888 F.2d 215, 218 (1st Cir.1989); *see also* S.Rep. No. 1333, *supra*, 1946 U.S.Code Cong.Serv. at 1274 ("where the owner of a trade-mark has spent energy, time, and money in presenting to the public the product, he is protected in his investment from its misappropriation by pirates and cheats"). Once again, this protection comprises more than merely stopping the sale of inferior goods. Even if an infringer creates a product that rivals or exceeds the quality of the registrant's product, the wrongful sale of the unauthorized product may still deprive the registrant of his ability to shape the contours of his reputation. *See Jordan K. Rand, Ltd. v. Lazoff Bros.*, 537 F.Supp. 587, 597 (D.P.R.1982).

2. *Territoriality.* In general, trademark rights are congruent with the boundaries of the sovereign that registers (or recognizes) the mark. Such territoriality reinforces the basic goals of trademark law. Because products are often tailored to specific national conditions, *see Lever Bros. Co. v. United States*, 877 F.2d 101, 108 (D.C.Cir.1989), a trademark's reputation (and, hence, its goodwill) often differs from nation to nation. *See Osawa & Co. v. B & H Photo*, 589 F.Supp. 1163, 1173 (S.D.N.Y.1984) ("a mark may have not only a separate legal basis but also a different factual significance in each separate country where the local mark owner has developed an independent goodwill"). Because that is so, the importation of goods properly trademarked abroad but not intended for sale locally may confuse consumers and may well threaten the local mark owner's goodwill. It is not surprising, then, that

the United States Supreme Court long ago recognized the territoriality of trademark rights. *See, e.g., A. Bourjois & Co. v. Aldridge,* 263 U.S. 675, 44 S.Ct. 4, 68 L.Ed. 501 (1923) (per curiam); *A. Bourjois & Co. v. Katzel,* 260 U.S. 689, 43 S.Ct. 244, 67 L.Ed. 464 (1923). These cases bear scrutiny.

In *Katzel,* the plaintiff, a United States corporation, purchased the American trademarks and goodwill of a French face powder manufacturer. Thereafter, it continued to sell the imported French powder in the United States, taking pains to conduct its sales efforts in a fashion "suitable for the American market." *Katzel,* 260 U.S. at 691, 43 S.Ct. at 245. The Court held that the defendant's sale of the same French powder, similarly packaged, within the United States infringed plaintiff's trademark rights, notwithstanding that defendant's merchandise, purchased in France, was "the genuine product of the French concern." *Id.* The Court explained that defendant's use of the trademark misrepresented the goods' origin because, in the United States, the label "indicates in law . . . that the goods come from the plaintiff although not made by it," and the name "stakes the reputation of the plaintiff upon the character of the goods." *Id.* at 692, 43 S.Ct. at 245. In *Aldridge,* a case involving similar circumstances, the Supreme Court reaffirmed the protection due domestic trademark holders against imported merchandise that is genuine abroad. *See Aldridge,* 263 U.S. at 676, 44 S.Ct. at 4.

■ Of course, territoriality only goes so far. By and large, courts do not read *Katzel* and *Aldridge* to disallow the lawful importation of *identical* foreign goods carrying a valid foreign trademark. *See, e.g., NEC Elecs., Inc. v. Cal Circuit Abco,* 810 F.2d 1506 (9th Cir.), *cert. denied,* 484 U.S. 851, 108 S.Ct. 152, 98 L.Ed.2d 108 (1987). Be that as it may, territorial protection kicks in under the Lanham Act where two merchants sell physically different products in the same market and under the same name, *see, e.g., Lever Bros.,* 877 F.2d at 107, for it is this prototype that impinges on a trademark holder's goodwill and threatens to deceive consumers. Indeed, without such territorial trademark protection, competitors purveying country-specific products could exploit consumer confusion and free ride on the goodwill of domestic trademarks with impunity. Such a scenario would frustrate the underlying goals of the Lanham Trade–Mark Act, the "plain language and general sweep" of which "undeniably bespeak an intention to protect domestic trademark holders." *Lever Bros.,* 877 F.2d at 105. Thus, where material differences exist between similarly marked goods, the Lanham Trade–Mark Act honors the important linkage between trademark law and geography.

### B. *The Provisions at Issue Here.*

In this court, as below, the plaintiffs ground their trademark infringement and unfair competition claims in Lanham Trade–Mark Act sections 32(1)(a), 42, and 43(a)(1), 15 U.S.C. §§ 1114(1)(a), 1124, 1125(a)(1) (1988). The district court considered and rejected each provision as a basis for relief. In so doing, the court misinterpreted the proper scope of the protection these three sections confer.

1. *Section 32(1)(a).* The court below found no violation of Lanham Trade–Mark Act section 32(1)(a).[5] It reasoned that Alimentos used the PERUGINA trademark with Nestle's consent and that merely "exporting [the chocolates] outside the area defined in a restrictive territorial clause . . . [would] not turn an otherwise genuine PERUGINA product into a counterfeit one or a colorable imitation." *Societe Des Produits Nestle,* 777 F.Supp. at 165.

---

**5.** Lanham Trade–Mark Act section 32(1)(a) provides:

(1) Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant. . . .

15 U.S.C. § 1114(1)(a) (1988).

On this point, the district court's analysis is doubly flawed. First, if "consent" is at all germane in determining whether a defendant's sale violates section 32(1)(a), the relevant consent is not the registrant's consent to a third party's use of the mark abroad but the registrant's consent (or lack thereof) to the defendant's sale of the gray good in the domestic market. *See Original Appalachian Artworks, Inc. v. Granada Elecs., Inc.*, 816 F.2d 68, 73 (2d Cir.), *cert. denied*, 484 U.S. 847, 108 S.Ct. 143, 98 L.Ed.2d 99 (1987).

Second, although it has been said that "[t]rademark law generally does not reach the sale of genuine goods bearing a true mark even though such sale is without the mark owner's consent," *NEC Elecs.*, 810 F.2d at 1509; *see also Shell Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104, 107 (4th Cir.1991), the maxim does not apply when genuine, but unauthorized, imports differ materially from authentic goods authorized for sale in the domestic market. Thus, contrary to the district court's thinking, an unauthorized importation may well turn an otherwise "genuine" product into a "counterfeit" one. In other words, the unauthorized importation and sale of materially different merchandise violates Lanham Trade–Mark Act section 32 because a difference in products bearing the same name confuses consumers and impinges on the local trademark holder's goodwill. *See Original Appalachian*, 816 F.2d at 73; *El Greco Leather Prods. Co. v. Shoe World, Inc.*, 806 F.2d 392, 395–96 (2d Cir.1986), *cert. denied*, 484 U.S. 817, 108 S.Ct. 71, 98 L.Ed.2d 34 (1987); *PepsiCo Inc. v. Giraud*, 7 U.S.P.Q.2d 1371, 1373 (D.P.R.1988); *Dial Corp. v. Encina Corp.*, 643 F.Supp. 951, 955 (S.D.Fla.1986).

■ It follows that the Venezuelan chocolates purveyed by Casa Helvetia were not "genuine" within the meaning of section 32 if they (a) were not authorized for sale in the United States and (b) differed materially from the authorized (Italian-made) version. *Cf. Monte Carlo Shirt, Inc. v. Daewoo Int'l (Am.) Corp.*, 707 F.2d 1054, 1057 (9th Cir.1983) (finding no section 32 violation where imported goods were identical to domestic goods and were intended for sale in the United States); *Sasson Jeans, Inc. v. Sasson Jeans, L.A., Inc.*, 632 F.Supp. 1525, 1528 (S.D.N.Y.1986) (similar).

■ The first prong of this two-part test is easily resolved. The mere licensing of production abroad does not support an inference of consent to import the licensed products into the United States. *See Lever Bros.*, 877 F.2d at 109–10; *see also Osawa*, 589 F.Supp. at 1171 (rejecting the proposition that merchandise with a lawful trademark in one country "carr[ies] that mark lawfully wherever it [goes]"). Here, the record is pellucid that Nestle never authorized the sale of Venezuelan-made chocolates in Puerto Rico. The question of whether Casa Helvetia infringed the PERUGINA mark under section 32, therefore, boils down to whether material differences exist between the Italian-made product and the Venezuelan-made product sufficient to create a likelihood of consumer confusion, mistake, or deception.

2. *Section 42.* The district court held that plaintiffs' claims under Lanham Trade–Mark Act section 42 lacked merit because the "plain language of the statute does not bar importation if the goods are genuine, only if they 'copy or simulate' a trademark." *Societe Des Produits Nestle*, 777 F.Supp. at 165.[6] We think this view is overly simplistic.

Section 42 draws no indelible line between "genuine" goods and goods that

**6.** Lanham Trade–Mark Act § 42 provides (with exceptions not relevant here):

... [N]o article of imported merchandise which shall copy or simulate the name of ... any domestic manufacture, or manufacturer, or trader, or of any manufacturer or trader located in any foreign country which, by treaty, convention, or law affords similar privileges to citizens of the United States, or which shall copy or simulate a trademark registered in accordance with the provisions of this chapter or shall bear a name or mark calculated to induce the public to believe that the article is manufactured in the United States, or that it is manufactured in any foreign country or locality other than the country or locality in which it is in fact manufactured, shall be admitted to entry at any customhouse of the United States....

15 U.S.C. § 1124 (1988).

"copy or simulate" a trademark. *See Lever Bros.*, 877 F.2d at 105. However, the statute aims to eradicate deceit and minimize consumer confusion. *See id.* at 111. As underscored by *Katzel's* recognition of territorial values in trademark law, the potential for consumer confusion is extremely high when a product catering to the indigenous conditions of a foreign country competes domestically against a physically different product that bears the same name. In such a case, the foreign product can legitimately be said to "copy or simulate" the domestic mark because use of the identical nomenclature "is simply not truthful." *Id.* at 108.

■ Accordingly, the importation of a gray good identical to a good authorized for sale in the domestic market does not violate section 42. *See Weil Ceramics & Glass, Inc. v. Dash*, 878 F.2d 659, 668 (3d Cir.), *cert. denied*, 493 U.S. 853, 110 S.Ct. 156, 107 L.Ed.2d 114 (1989); *Olympus Corp. v. United States*, 792 F.2d 315, 321 (2d Cir.1986), *cert. denied*, 486 U.S. 1042, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988). But, the existence of physical differences changes the result. *See Lever Bros.*, 877 F.2d at 111 ("the natural, virtually inevitable reading of § 42 is that it bars foreign goods [that] bear[ ] a trademark identical to a valid U.S. trademark but [that] physically differ[ ], regardless of the trademarks' [*sic* ] genuine character abroad"). Therefore, under section 42, as under section 32, the question of whether Casa Helvetia infringed the PERUGINA mark hinges on whether physical or like material differences exist between the Italian-made and Venezuelan-made products.[7]

■ 3. *Section 43(a)(1).* In respect to Lanham Trade–Mark Act section 43(a)(1),[8] the district court rejected Nestle's claim because the parties' boxes clearly specified the respective countries of origin, *i.e.*, Casa Helvetia's chocolates were labelled "made in Venezuela" and Nestle's chocolates were labelled "made in Italy." *See Societe Des Produits Nestle*, 777 F.Supp. at 164. Section 43's proscriptions, however, are not so narrow in scope. The statutory prohibition against false designation of origin encompasses more than deceptions as to geographic origin; it extends, as well, to "origin of source, sponsorship or affiliation." 2 McCarthy, *supra*, § 27:3, at 345. In short, the use of a mark may be deceptive and, thus, violative of section 43(a), in light of the overall appearance of the package, despite the existence of fine print identifying the true origin; that is, such a package may falsely convey the impression that the domestic mark holder intended the importation of the good into the local market.

The case of *Ferrero U.S.A., Inc. v. Ozak Trading, Inc.*, 753 F.Supp. 1240 (D.N.J.), *aff'd*, 935 F.2d 1281 (3d Cir.1991), aptly illustrates the point. There, the district court invoked section 43(a) and enjoined the parallel importation of TIC TAC mints despite the fact that the infringing product was identified as originating with the "sole importer for the U.K." *Id.* at 1243. The court emphasized that material differences in caloric content and size, in conjunction with a virtually identical outward appearance, created the distinct potential for consumer confusion. *See id.* at 1247.

We conclude, therefore, that the key question in determining Casa Helvetia's lia-

7. We think the appropriate test should not be strictly limited to physical differences. Other sorts of differences—differences in, say, warranty protection or service commitments—may well render products non-identical in the relevant Lanham Trade–Mark Act sense. *See, e.g., Original Appalachian*, 816 F.2d at 73; *Osawa*, 589 F.Supp. at 1168–69.

8. Lanham Trade–Mark Act § 43(a)(1) provides:
Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
(1) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ... shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
15 U.S.C. § 1125(a)(1) (1988).

bility under section 43(a) is whether material differences likely to confuse consumers exist between Venezuelan–made and Italian–made chocolates bearing the same mark. *Accord New West Corp. v. NYM Co. of Cal., Inc.*, 595 F.2d 1194, 1201 (9th Cir.1979) (under section 43(a), "the ultimate test is whether the public is likely to be deceived or confused"); *Quabaug Rubber Co. v. Fabiano Shoe Co.*, 567 F.2d 154, 160 (1st Cir.1977) ("The basis for an action under [section 43(a)] is use of a mark ... which is likely to cause confusion or to deceive purchasers concerning the source of the goods."); *see also* 2 McCarthy, *supra*, § 27:3, at 345–48 (explaining that section 43 covers traditional trademark claims for which the test of liability is likelihood of confusion).

### C. *Synthesis.*

In this case, all roads lead to Rome. Whether the fulcrum of plaintiffs' complaint is perceived as section 32(1)(a), section 42, or section 43(a), liability necessarily turns on the existence *vel non* of material differences between the products of a sort likely to create consumer confusion. *Accord Ferrero*, 753 F.Supp. at 1246 n. 10 (observing that the same reasoning applies under all three provisions). Because the presence or absence of a material difference—a difference likely to cause consumer confusion—is the pivotal determinant of Lanham Trade–Mark Act infringement in a gray goods case, the lower court's insistence on several other evidentiary showings was inappropriate.

■ In the first place, the district court erred in envisioning a need to prove actual product confusion. In suing under any of the three Lanham Trade–Mark Act provisions, a plaintiff need only show that a likelihood of confusion is in prospect; a showing of actual confusion is not required. *See, e.g., Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 171 (2d Cir.1991) (construing Lanham Act § 32); *Keds Corp.*, 888 F.2d at 218 (same); *International Armament Corp. v. Matra Manurhin Int'l, Inc.*, 630 F.Supp. 741, 747 (E.D.Va.1986) (construing Lanham Trade–

Mark Act § 42); *Quabaug*, 567 F.2d at 160 (construing Lanham Trade–Mark Act § 43). Indeed, federal courts have routinely granted injunctions in gray goods cases notwithstanding an absence of evidence of actual consumer confusion. *See, e.g., Ferrero*, 753 F.Supp. at 1247; *PepsiCo v. Giraud*, 7 U.S.P.Q.2d at 1371. In such cases, a material difference between goods simultaneously sold in the same market under the same name creates a presumption of consumer confusion as a matter of law. *See Ferrero*, 753 F.Supp. at 1247; *PepsiCo Inc. v. Nostalgia Products Corp.*, 18 U.S.P.Q.2d 1404, 1407, 1991 WL 113161 (N.D.Ill.1990); *PepsiCo v. Giraud*, 7 U.S.P.Q.2d at 1373.

■ In the second place, the district court erred in suggesting that proof of actual harm to Nestle's goodwill was a prerequisite to finding a Lanham Trade–Mark Act violation. The Lanham Act contains no such proof-of-injury requirement. By its very nature, trademark infringement results in irreparable harm because the attendant loss of profits, goodwill, and reputation cannot be satisfactorily quantified and, thus, the trademark owner cannot adequately be compensated. Hence, irreparable harm flows from an unlawful trademark infringement as a matter of law. *See Keds Corp.*, 888 F.2d at 220; *Geoffrey, Inc. v. Toys 'R Us*, 756 F.Supp. 661, 668 (D.P.R.1991); *Jordan K. Rand*, 537 F.Supp. at 597.

■ In the third place, the district court seemingly considered it essential for Nestle to prove that the Venezuelan-made chocolates were inferior in quality to the Italian-made chocolates. *See Societe Des Produits Nestle*, 777 F.Supp. at 167. This, too, was error. A showing that the alleged infringing product suffers in quality is not necessary to prove a Lanham Trade–Mark Act violation. *See Truck Equip.*, 536 F.2d at 1216.

## III. THE MATERIALITY THRESHOLD

When a trial court misperceives and misapplies the law, remand may or may not be essential. Here, a final judgment under the correct rule of law requires only the

determination of whether reported differences between the Venezuelan and Italian products are material. It follows, then, that we must examine the legal standard for materiality before deciding whether to remand.

Under the Lanham Trade–Mark Act, only those appropriations of a mark that are likely to cause confusion are prohibited. Ergo, when a product *identical* to a domestic product is imported into the United States under the same mark, no violation of the Lanham Trade–Mark Act occurs. *See, e.g., Weil,* 878 F.2d at 668. In such a situation, consumers get exactly the bundle of characteristics that they associate with the mark and the domestic distributor can be said to enjoy in large measure his investment in goodwill. By the same token, using the same mark on two blatantly different products normally does not offend the Lanham Trade–Mark Act, for such use is unlikely to cause confusion and is, therefore, unlikely to imperil the goodwill of either product. *See, e.g., Blazon, Inc. v. Blazon Mobile Homes Corp.,* 416 F.2d 598, 600 (7th Cir.1969) (holding that defendant's use of a trade name for trailers and campers did not infringe plaintiff's use of the same mark on children's toys, sporting goods, and lawn furniture).

The probability of confusion is great, however, when the same mark is displayed on goods that are not identical but that nonetheless bear strong similarities in appearance or function. Gray goods often fall within this category. Thus, when dealing with the importation of gray goods, a reviewing court must necessarily be concerned with subtle differences, for it is by subtle differences that consumers are most easily confused. For that reason, the threshold of materiality must be kept low enough to take account of potentially confusing differences—differences that are not blatant enough to make it obvious to the average consumer that the origin of the product differs from his or her expectations.

There is no mechanical way to determine the point at which a difference becomes "material." Separating wheat from chaff must be done on a case-by-case basis. Bearing in mind the policies and provisions of the Lanham Trade–Mark Act as they apply to gray goods, we can confidently say that the threshold of materiality is always quite low in such cases. *See Lever Bros.,* 877 F.2d at 103, 108 (finding minor differences in ingredients and packaging between versions of deodorant soap to be material); *Ferrero,* 753 F.Supp. at 1241–49, 1247 (finding a one-half calorie difference in chemical composition of breath mints, coupled with slight differences in packaging and labeling, to be material); *PepsiCo Inc. v. Nostalgia,* 18 U.S.P.Q.2d at 1405 (finding "differences in labeling, packaging and marketing methods" to be material); *PepsiCo v. Giraud,* 7 U.S.P.Q.2d at 1373 (finding differences not readily apparent to the consumer—container volume, packaging, quality control, and advertising participation—to be material); *Dial Corp.,* 643 F.Supp. at 952 (finding differences in formulation and packaging of soap products to be material).

We conclude that the existence of any difference between the registrant's product and the allegedly infringing gray good that consumers would likely consider to be relevant when purchasing a product creates a presumption of consumer confusion sufficient to support a Lanham Trade–Mark Act claim. Any higher threshold would endanger a manufacturer's investment in product goodwill and unduly subject consumers to potential confusion by severing the tie between a manufacturers's protected mark and its associated bundle of traits.

The alleged infringer, of course, may attempt to rebut this presumption, *see Coach Leatherware,* 933 F.2d at 170; *cf. Resource Developers, Inc. v. Statue of Liberty–Ellis Island Found.,* 926 F.2d 134, 140 (2d Cir.1991) (shifting the burden "to the defendant to demonstrate the absence of consumer confusion" in an action for damages), but in order to do so he must be able to prove by preponderant evidence that the differences are not of the kind that consumers, on average, would likely consider in purchasing the product.

## IV. MATERIALITY IN THIS CASE

■ Having fashioned the standard of materiality[9] and examined the record in light of that standard, we are drawn to the conclusion that remand is not required. The district court determined that the products are different but that the differences are not material. *See Societe des Produits Nestle*, 777 F.Supp. at 166. Although this determination is tainted by a misunderstanding of the applicable legal principles, the court's subsidiary findings are, nonetheless, reasonably explicit and subject to reuse. Hence, we proceed to take the lower court's supportable findings of fact, couple them with other, uncontradicted facts, and, using the rule of law articulated above, determine for ourselves whether the admitted differences between the Venezuelan-made chocolates and the Italian-made chocolates are sufficiently material to warrant injunctive relief. *See, e.g., United States v. Mora*, 821 F.2d 860, 869 (1st Cir. 1987) (concluding that, in a case in which the trial court supportably "made the key findings of fact" but applied the wrong rule of law, the court of appeals had the power, in lieu of remanding, simply to regroup the findings "along the [proper] matrix").

### A. *A Catalog of Differences.*

The district court identified numerous differences between the competing products. Because the record supports these findings and the parties do not contest their validity, we accept them. We add, however, other potentially significant distinctions made manifest by the record. *See Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 972 F.2d 453, 463 (1st Cir.1992) (stating that "appellate factfinding is permissible ... when no other resolution of a factbound question would, on the compiled record, be sustainable") (collecting cases).

1. *Quality Control.* Although Nestle and Casa Helvetia each oversees the quality of the product it sells, the record reflects, and Casa Helvetia concedes, that their procedures differ radically. The Ital-

ian PERUGINA leaves Italy in refrigerated containers which arrive at Nestle's facility in Puerto Rico. Nestle verifies the temperature of the coolers, opens them, and immediately transports the chocolates to refrigerated rooms. The company records the product's date of manufacture, conducts laboratory tests, and destroys those candies that have expired. It then transports the salable chocolates to retailers in refrigerated trucks. Loading and unloading is performed only in the cool morning hours.

On the other hand, the Venezuelan product arrives in Puerto Rico via commercial air freight. During the afternoon hours, airline personnel remove the chocolates from the containers in which they were imported and place them in a central air cargo cooler. The next morning, employees of Casa Helvetia open random boxes at the airport to see if the chocolates have melted. The company then transports the candy in a refrigerated van to a warehouse. Casa Helvetia performs periodic inspections before delivering the goods to its customers in a refrigerated van. The record contains no evidence that Casa Helvetia knows or records the date the chocolates were manufactured.

2. *Composition.* The district court enumerated a number of differences in ingredients. The Italian BACI candies have five percent more milk fat than their Venezuelan counterparts, thus prolonging shelf life. Furthermore, the Italian BACI chocolates contain Ecuadorian and African cocoa beans, fresh hazelnuts, and cooked sugar syrup, whereas the corresponding Venezuelan candies are made with domestic beans, imported hazelnuts, and ordinary crystal sugar. *See Societe Des Produits Nestle*, 777 F.Supp. at 163–64.

3. *Configuration.* The district court specifically noted that the Italian chocolates in the Maitre Confiseur and Assortment collections come in a greater variety of shapes than the Venezuelan pieces. *See id.* at 164.

---

9. We note that fashioning the appropriate legal standard presents a pure question of law, subject to *de novo* review. *See, e.g., Stauble v. Warrob*, 977 F.2d 690, 693 (1st Cir.1992).

4. *Packaging.* The district court observed differences in the "boxes, wrappers and trays" between the Italian and Venezuelan versions of the various chocolate assortments. *Id.* For example, the packages from Italy possess a glossy finish and are either silver, brown, or gold in color. The Venezuelan boxes lack the shiny finish. They are either blue, red, or yellow in color. While the Italian sweets sit in gold or silver trays, their Venezuelan counterparts rest on white or transparent trays. The Italian boxes depict the chocolates inside and describe the product in English, French, and Italian. The Venezuelan packages describe the contents only in Spanish and English. Moreover, only the BACI box illustrates what is inside.

5. *Price.* The district court pointed out that while the Venezuelan and Italian BACI collections contain the same quantity of chocolate (8 oz.), the Italian BACI sells for $12.99 and the Venezuelan BACI costs $7.50. *See id.* at 163. The record also reflects that the Italian version of the Assortment collection (14.25 oz. for $26.99) weighs less and is more expensive than the Venezuelan version (15.6 oz. for $22.99).

## B. *Applying the Standard.*

Applying the legal standard discussed in Part III, *supra*, to the record at bar, it is readily apparent that material differences exist between the Italian and Venezuelan PERUGINA. These differences—which implicate quality, composition, packaging, and price—if not overwhelming, are certainly relevant. We run the gamut.

Differences in quality control methods, although not always obvious to the naked eye, are nonetheless important to the consumer. The precautions a company takes to preserve a food product's freshness are a prime example. Here, the parties' quality control procedures differ significantly. Even if Casa Helvetia's quality control measures are as effective as Nestle's—a dubious proposition on this record—the fact that Nestle is unable to oversee the quality of the goods for the entire period until they reach the consumer is significant in ascertaining whether a Lanham Act violation exists. *See El Greco,* 806 F.2d at 395 (stating that "actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain"). Regardless of the offending goods' actual quality, courts have issued Lanham Trade–Mark Act injunctions solely because of the trademark owner's inability to *control* the quality of the goods bearing its name. *See id.* at 396 (barring sale in the United States of trademarked shoes under Lanham Trade–Mark Act § 32 because the registrant had no opportunity to inspect the shoes' quality); *see also Shell Oil,* 928 F.2d at 107 (affirming that oil marketed according to defendant's quality control procedures, rather than the plaintiff's, was not "truly 'genuine,'" and its sale violated the plaintiff's Lanham Trade–Mark Act right "to retain control of the use of its trademark in the sale of the product to the end user"). Thus, the substantial variance in quality control here creates a presumption of customer confusion as a matter of law. *See id.* at 108.

The differences in presentation of the candies are also material. Although the district court dismissed the differences in packaging as "subtle," *Societe Des Produits Nestle,* 777 F.Supp. at 166, subtle differences are, as we have said, precisely the type that heighten the presumption of customer confusion. Consumers are more likely to be confused as to the origin of different goods bearing the same name when both goods are substantially identical in appearance. Furthermore, the differences in presentation and chocolate shape strike us as more than subtle. Glossy veneers, gold and silver wraps, and delicate sculpting add to the consumer's perception of quality. In the market for premium chocolates, often purchased as gifts, an elegant-looking package is an important consideration. The cosmetic differences between the Italian-made and the Venezuelan-made PERUGINA, therefore, might well perplex consumers and harm Nestle's goodwill.

We are also hesitant to dismiss as trivial the differences in ingredients. While the district court may be correct in suggesting that "the ultimate consumer is [not] con-

644

cerned about the country of origin of cocoa beans and hazelnuts," *id.* at 166–67, the measure of milk fat in the chocolates is potentially significant. Certainly, consumers care about the expected shelf life of food products.

Price, without doubt, is also a variable with which purchasers are concerned. To the consumer (perhaps a gift buyer) who relishes a higher price for its connotation of quality and status, as well as to the chocolate aficionado who values his wallet more than his image, a difference of nearly five and a half dollars (or, put another way, 73 percent) on a half-pound box of chocolate is a relevant datum. Furthermore, the fact that consumers are willing to pay over five dollars more for the Italian-made chocolate than for its Venezuelan counterpart may suggest that consumers *do* care about the other differences between the two products. Afforded perfect information, consumers indifferent between the two would presumably not be willing to pay more for one than for the other.

We need go no further. Given the low threshold of materiality that applies in gray goods cases, we find the above dissimilarities material in the aggregate. The use of the same PERUGINA label on chocolates manifesting such differences is presumptively likely to cause confusion. Casa Helvetia could, of course, have offered evidence to rebut this presumption—but it has not done so. There is no proof that retailers explain to consumers the differences between the Italian and Venezuelan products. The record is likewise devoid of any evidence that consumers are indifferent about quality control procedures, packaging, ingredients, or price.[10] Because the differences between the Italian and Venezuelan PERUGINA chocolates are material, the district court erred in denying plaintiffs' trademark infringement and unfair competition claims under Lanham Trade–Mark Act sections 32(1)(a), 42, and 43(a)(1).

*Reversed and remanded for the entry of appropriate injunctive relief and for further proceedings not inconsistent herewith. Costs to appellants.*

---

**10.** The lack of evidence of consumer complaints does not buttress Casa Helvetia's case. Rather than complain, a dissatisfied consumer may well simply avoid all PERUGINA products in the future. *See Union Carbide Corp. v. Ever-* *Ready Inc.,* 531 F.2d 366, 383 (7th Cir.) (noting that purchasers of modestly valued items are "unlikely to complain when dissatisfied"), *cert. denied,* 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976).