**MULTI–LOCAL MEDIA CORP.; and Yellow Book Co., Inc., Plaintiffs,**

v.

**800 YELLOW BOOK INC.; 800 Yellow Book of Delaware, Inc.; Mac Beagelman; and Gershon Tannenbaum, Defendants.**

**No. 93 CV 314 (TCP).**

United States District Court,
E.D. New York.

Feb. 22, 1993.

Lankenau Kovner & Kurtz, New York City, Josephine Lea Iselin, Alexandra Nicholson, for plaintiff.

Michael S. Krome, Hempstead, NY, for defendant.

## MEMORANDUM AND ORDER

PLATT, Chief Judge.

By an Order to Show Cause with an affidavit annexed thereto, plaintiffs seek a temporary restraining order and preliminary injunction. This Court received testimony and exhibits in connection with plaintiffs' application over a two-day period, January 27 through January 28, 1993. Based upon the facts and reasoning set forth below, this Court grants plaintiffs' application for a preliminary injunction.

BACKGROUND

Yellow Book and its parent Multi–Local Media ("MLM") comprise one of the largest non-telephone-company publishers of classified telephone directories in the United States. Every year since 1938, Yellow Book and its predecessors have published and distributed to the communities of Long Island millions of community classified telephone directories under the trademark "Yellow Book". (Aff. of Randall W. Antik at 2 [hereinafter "Antik Aff."].) At present, Yellow Book directories have an annual circulation of over 2.3 million copies of 94 different directories covering the com-

munities of Nassau County, Suffolk County, Queens, and Brooklyn. (Antik Aff. at 2; Test. of Joseph A. Walsh, Jan. 27, 1993, Tr. at 85, 86 [hereinafter "Walsh Test.".) Another 1.2 million copies of 26 different directories are circulated in Palm Beach and Broward Counties through MLM's Florida subsidiary. (Antik Aff. at 3; Walsh Testimony at 86.)

Since 1988, plaintiffs have also published annually a one-volume classified directory under the "Yellow Book" mark, entitled Business to Business Yellow Pages. (Plfs.' Ex. 2.) This directory lists all businesses located in the four-county region of Nassau, Suffolk, Queens, and Brooklyn and is distributed free-of-charge to businesses in those areas for use primarily by their marketing and purchasing agents. (Antik Aff. at 7.) A smaller, executive edition of the Yellow Book Business to Business Yellow Pages is distributed free-of-charge to many of the advertisers' senior executives. Annual circulation of both the large and small editions of the Business to Business directory is currently 500,000. (Plfs.' Ex. 6.)

Plaintiffs also offer various telephone services to the users of their directories. The Yellow Book "Talking Pages", described in the front of each community directory, permits telephone users to call various local telephone numbers and receive information on such topics as the weather, sports, medicine, and insurance, each prepared and sponsored by a paid advertiser. (Plfs.' Ex. 3.) In addition, the Business to Business directory provides the "Electronic Business to Business Directory" service, which permits users, for the cost of a local telephone call, to access the information in the printed directory, as well as additional information concerning the businesses of the area. (Plfs.' Exs. 2 & 4.)

The community directories are distributed free-of-charge to the telephone subscribers in the area covered by the particular directory. Thus, the principal source of revenue from plaintiffs' directories is the sale of paid listings and "display" advertisements carried in the classified pages of the directories and on the directory covers and inserts, as well as the sale of "audio-text" lines on the "Talking Pages" service. (Antik Aff. at 4.)

Plaintiffs employ and train a sales force of over one hundred persons who solicit advertising for the Yellow Book directories on a local and regional basis. (Antik Aff. at 5–6.) In addition, advertising is solicited by plaintiffs' sales force for "National Accounts" (businesses with a nationwide presence, such as Midas Muffler and All State Insurance) through national advertising firms. (Antik Aff. at 6.)

Over the past sixty years, Yellow Book has spent millions of dollars in advertising and promoting its Yellow Book mark in connection with its directories and directory-related services. Plaintiffs' advertising and promotional expenditures during the past five years alone (1988 through 1992) reached $4 million; gross sales during this period reached $247 million. (Antik Aff. at 3.)

Sometime in the spring of 1992, defendants Mac Beagelman and Gershon Tannenbaum developed a plan to incorporate an electronic directory referral service and to use "800 Yellow Book" as a title and a phone number for this service. (Test. of Mac Beagelman, Jan. 28, 1993, Tr. at 212–14 [hereinafter "Beagelman Test."].) The plan included licensing agencies to solicit advertisers from various businesses and professionals in an area consisting of approximately one million people in geographic Long Island, Manhattan, Connecticut, and part of Canada, with the intention of eventually expanding the service to cover the entire nation. (Beagelman Test. at 214.) The licensees or agencies would take up to four advertisers per occupational or professional category at an annual fee of $250, with a potentially limitless number of categories. Callers dialing the service's telephone number 800–935–5692 (i.e., 800–YEL–LOWB) select a particular category and are given the telephone numbers of up to four businesses in their preferred location. (Beagelman Test. at 216–17.)

DISCUSSION

In their application, plaintiffs seek an order preliminarily enjoining and restraining, in the New York counties of Kings,

Queens, Nassau, Suffolk, Westchester, and New York, and in the Florida counties of Broward, Palm Beach, Dade, Martin, and Indian River, defendants and all those acting in concert with them from:

(i) using the phrase "yellow book", or any word, symbol, phrase or term confusingly similar thereto, alone or in combination with other words, as a trademark, service mark, tradename or otherwise in connection with the production, promotion, advertisement, display, distribution, offering for sale or sale of any classified telephone directories or related products or services;

(ii) displaying in any way the phrase "yellow book", or any word, symbol, phrase or term confusingly similar thereto alone or in combination with other words, as part of an "800" or "900" or other telephone number used in connection with classified telephone directories or related products or services;

(iii) using any simulation, reproduction, counterfeit, copy or colorable imitation of plaintiffs' common-law trademark "Yellow Book", or any marks confusingly similar thereto, in connection with the production, promotion, advertisement, display, distribution, offering for sale, or sale of any classified telephone directories or related products or services;

(iv) making any statement or representation whatsoever, or using any false designation of origin or false description (including, without limitation, any letters or symbols), or performing any act, which can or is likely to lead the trade or public, or individual members thereof, to believe that any telephone directories or related products or services produced, promoted, advertised, displayed, distributed, offered for sale or sold by defendants are in any manner associated or connected with plaintiffs, or are sold, manufactured, licensed, sponsored, approved or authorized by plaintiffs;

(v) engaging in any other activity constituting unfair competition with plaintiffs, or constituting an infringement of plaintiffs' trademark or of plaintiffs' rights in, or to use or to exploit, said trademark, or constituting any dilution of plaintiffs' name, business reputation or goodwill; or

(vi) assisting, aiding or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs (i) through (v) above. . . .

(Plfs.' Order to Show Cause for Preliminary Injunction and Temporary Restraining Order at 2–4 [hereinafter "Order to Show Cause"].) In addition, plaintiffs seek an order directing defendants to notify the telephone company not to connect to their telephone any call placed to the number 1–800 YELLOW BOOK (1–800–935–5692) that has originated from area codes 516, 718, 212, 914, 203, 908, 201, 407, and 305. (Order to Show Cause at 4.)

This action is brought pursuant to Section 43(a) of the Lanham Trademark Act, 15 U.S.C. § 1125(a) (1988), for trademark infringement, false designation of origin, and unfair competition. Federal courts have long recognized the need for immediate injunctive relief in trademark infringement cases due to the amorphous nature of the damage to the trademark and the resulting difficulty in proving monetary damages. *See, e.g., P. Daussa Corp. v. Sutton Cosmetics (P.R.), Inc.,* 462 F.2d 134, 136 (2d Cir.1972); *Omega Importing Corp. v. Petri–Kine Camera Corp.,* 451 F.2d 1190, 1195 (2d Cir.1971); *Playboy Enter., Inc. v. Chuckleberry Publ., Inc.,* 486 F.Supp. 414, 429 (S.D.N.Y.1980).

■ In order to obtain a preliminary injunction in a trademark case, the plaintiff must demonstrate: (a) either (i) a likelihood of success on the merits or (ii) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting preliminary relief; and (b) irreparable harm. *Hasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70, 73 (2d Cir.1988); *Warner Bros. v. Gay Toys, Inc.,* 658 F.2d 76, 78–79 (2d Cir.1981). Plaintiffs clearly satisfy the requirements for preliminary injunctive relief.

### A. *Likelihood of Success on the Merits*

■ To prevail in a trademark case brought under Section 43(a) of the Lanham Act, a plaintiff must show that it owns a valid trademark and that there is a likelihood of consumer confusion with regard to the origin of the service at issue. *Berlitz Schools of Languages of Am., Inc. v. Everest House*, 619 F.2d 211, 215 (2d Cir.1980).

### 1. Plaintiffs' Protected Interest in the "Yellow Book" Mark

■ A trademark is a territorially-based notion, with rights in the mark "extend[ing] to every market where the trader's goods have become known and identified by his use of the mark."[1] *Hanover Star Milling Co. v. Metcalf,* 240 U.S. 403, 416, 36 S.Ct. 357, 361, 60 L.Ed. 713 (1916). Exclusive rights in a particular mark depend upon its classification in relation to the goods or services on which it is used: generic, descriptive, suggestive, or arbitrary or fanciful. *Abercrombie & Fitch v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976) A "generic" term, or common name of a product, for example, is incapable of trademark protection. A "suggestive" term, or one requiring imagination in determining the nature of the goods, is accorded trademark protection without the need to show secondary meaning. *Abercrombie & Fitch,* 537 F.2d at 11. A "descriptive" term describing a particular characteristic of the product may be protected, but only if secondary meaning is shown. *Thompson Med. Co. Inc. v. Pfizer Inc.,* 753 F.2d 208, 212–13 (2d Cir.1985).

■ Secondary meaning exists where a substantial segment of the purchasing public in the relevant market associates a service designated by a mark with a particular source. *Centaur Communications v. A/S/M Communications,* 830 F.2d 1217, 1221–22 (2d Cir.1987); *Tripledge Prods., Inc.,* 735 F.Supp. at 1162. The factors to be considered in determining whether a product or service has acquired a secondary meaning include: (1) advertising expenditures; (2) consumer studies linking the mark to a single source; (3) unsolicited media coverage of the product or service; (4) sales success; (5) attempts to plagiarize the mark; and (6) length and exclusivity of the mark's use. *Centaur Communications,* 830 F.2d at 1222; *Tripledge Prods., Inc.,* 735 F.Supp. at 1162.

■ Regardless of how the trademark "Yellow Book" may be classified, there is no question but that it has acquired a secondary meaning in plaintiffs' trading areas. Over the past fifty years or more, plaintiffs' advertising expenses have been enormous.[2] Consumer studies linking the "Yellow Book" mark to plaintiffs as its source have been extensive. (Plfs.' Exs. 14 & 15; Antik Aff. at 14–15.) There has been unsolicited media coverage of their promotional efforts and their product.[3] Plaintiffs' sales increase is shown by its growth to almost $45 million per year in 1992. (Plfs.' Ex. 13.) There have been no attempts to plagiarize this mark in the areas in question other than by defendants and by another group who recently started a similar telephone directory referral service, also incorporated under the "800 Yellow Book Inc."

**1.** Plaintiff need not have registered its trademark in order to obtain relief under the Lanham Act. Section 43(a) "provides a civil remedy to one damaged by reason of either 'false or misleading advertising' or 'trademark' or 'trade dress' infringement." *Tripledge Prods., Inc. v. Whitney Resources, Ltd.,* 735 F.Supp. 1154, 1160 (E.D.N.Y.1990); *see also LeSportsac, Inc. v. K Mart Corp.,* 754 F.2d 71, 75 (2d Cir.1985).

**2.** Yellow Book has a sales force of over 100 salespeople and telemarketers who sell advertising to 30,000 customers in Brooklyn, Queens, and Nassau and Suffolk counties. (Walsh Test. at 90.) Yellow Book has spent more than $3 million on its advertising and promotional activities from 1988 to 1992. (Antik Aff. at 13.)

**3.** Various efforts on the part of Yellow Book to promote the "Yellow Book" mark include: (1) a cooperative promotional campaign with AT & T (Plfs.' Ex. 9); (2) a promotional flyer for the "Yellow Book Business-to-Business Yellow Pages Match-the-Number Contest"; (3) regular distribution of promotional pens, mugs, and tote bags with the "Yellow Book" mark at trade shows and conventions; (4) the company's fifteen-year-old School Map Program in which 51 schools and 683 students in the Long Island area participate. (Antik Aff. at 12–13.)

name.[4] Finally, plaintiffs have enjoyed exclusive use of the "Yellow Book" mark for over fifty years in their trading areas. (Antik Aff. at 19.) Thus, the fact that "Yellow Book" has acquired a secondary meaning in the areas in question and is therefore deserving of trademark protection under the Lanham Act is virtually indisputable.

### 2. Actual Confusion

■ Plaintiffs have also shown a strong likelihood of confusion by the public. In making such a determination, the Court must apply an equitable balancing test in which the following factors are considered: (1) the strength of the mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) the likelihood that the senior user of the mark will "bridge the gap"; (5) evidence of actual confusion; (6) the junior user's bad faith *vel non* in adopting the mark; (7) the quality of the junior user's product; and (8) the sophistication of the relevant consumer group. *Polaroid Corp. v. Polarad Elec. Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961); *see also Centaur Communications,* 830 F.2d at 1225.

As discussed extensively in Part A(1) of this Memorandum and Order, the strength of the Yellow Book mark is demonstrated by the fifty years of exclusive use by plaintiffs and by the substantial growth of plaintiffs' sales. *See McGregor–Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1131–32 (2d Cir.1979). The similarity of the new mark, "800 Yellow Book", to the pre-existing mark, "Yellow Book", is self-evident and is further accentuated by defendants' attempts to disclaim familiarity therewith and by the witnesses' testimony with regard to reports of confusion by longstanding customers. Indeed, defendants' designation is virtually identical to plaintiffs' in sight, sound, and appearance. *See Kelley Blue Book v. Car–Smarts,* 802 F.Supp. 278, 282 (C.D.Cal.1992) (Kelley Blue Book mark "substantially similar in sight, sound

and appearance" to defendant's "1–900 and 1–800 BLUBOOK"). The only difference between the two names is "800" and that is a generic term for toll-free calling that is incapable of distinguishing the two services.

Regarding the issue of competitive proximity, defendants' product is very much akin not only to Yellow Book's overall package of services, but also to the recently developed "Talking Yellow Book" portion of the Yellow Book. Defendants' logo—an open telephone directory with the well-recognized "do not use" symbol emblazoned across it and the tag line "Why let your fingers walk when it's easier to talk?"—makes clear that defendants are targeting plaintiffs' customers. (Plfs. Ex. 24.) Indeed, defendants' service provides essentially the same information to the telephone user as plaintiffs' directories: both plaintiffs and defendants provide classified business listings in a particular community. Defendants' demonstrated willingness to hire a former Yellow Book salesperson, use Yellow Book marketing materials, and solicit Yellow Book advertisers is further indication of the competitive proximity that characterizes the two services. (Walsh Test. at 96–109.) Moreover, because the two services are in direct competition with one another, there is no gap to bridge, thereby satisfying the fourth *Polaroid* factor.

Evidence of actual confusion on the part of plaintiff Yellow Book's advertisers and users was amply demonstrated in Part A(2) of this Memorandum and Order. In addition, Joseph A. Walsh, Group Vice–President of Sales for plaintiff Yellow Book, testified convincingly regarding reports from the Yellow Book sales force of confusion among many of the company's longtime advertisers. For example, John Mitre, an administrative employee in Yellow Book's Talking Yellow Book Department, received several telephone calls asking whether 800 Yellow Book was part of plaintiff's Talking Yellow Book service. (Walsh Test. at 102–03.) Sylvia Chester, national

---

**4.** On objection by plaintiffs, this latter group agreed to cease all use of the "Yellow Book" mark in connection with their business. (Aff. of Milton L. Sanders, Esq., at 6.)

sales manager of Yellow Book, also reported confusion regarding 800 Yellow Book by Yellow Book customer Manhasset Bay Plumbing. (Walsh Test. at 104.) Finally, Richard Alderson, Director of Voice Information Systems for Yellow Book, received a telephone call from advertiser ABC Psychotherapy, inquiring whether 800 Yellow Book was affiliated with plaintiff. (Walsh Test. at 105; Plfs.' Ex. 22.)

Defendants' bad faith in choosing the name "800 Yellow Book" has also been amply demonstrated. Defendant Beagelman testified that, although he has lived with his family in Westbury, Long Island, for the past thirty-five years and has also been in business in Plainview, Long Island, for a number of years, he was not familiar with the Yellow Book. (Test. of Mac Beagelman, Jan. 28, 1993, Tr. at 202 [hereinafter "Beagelman Test."].) Nevertheless, Beagelman conceded at the hearing that, despite not publishing anything which resembles a book, defendants decided to use the name Yellow Book for their service. (Beagelman Test. at 191.) Defendants also conceded that in selecting "800 Yellow Book" for their service, they chose a name and not a telephone number. This Court does not credit defendants' testimony implying that the name "800 Yellow Book" somehow emanated "out of the blue". (Beagelman Test. at 207–08.) It is abundantly clear that the name and the telephone number were selected in order to capitalize on the time, money, work, and other investments by plaintiffs in the development and establishment of the name "Yellow Book".

The quality of defendants' service is not fully evident because it is still in its infancy. Nonetheless, plaintiffs have received numerous complaints with respect thereto. (Aff. of Joseph A. Walsh at 9 [hereinafter "Walsh Aff."].)

The lack of sophistication of the relevant consumer group is demonstrated by reports of directory users and advertisers who believed that 800 Yellow Book was in fact a service of Yellow Book. (Plfs.' Exs. 20–22.)

In short, the Court finds there is a strong likelihood of confusion which is resulting from defendants' use of the mark "800 Yellow Book". Given all of the foregoing, it is clear to this Court that plaintiffs have shown a strong likelihood of success on the merits.

### B. Irreparable Harm

Where a plaintiff in a trademark case has established a likelihood of consumer confusion, "irreparable injury ... almost inevitably follows" and, indeed, is presumed. *Omega Importing Corp. v. Petri–Kine Camera Corp.*, 451 F.2d 1190, 1195 (2d Cir.1971). The proof with respect to the likelihood of confusion presented above shows the inevitability of irreparable harm to the plaintiffs by defendants' continued use of the words "Yellow Book" in their title and telephone number. Since injury to plaintiffs' goodwill is not compensable by money damages, only injunctive relief will adequately remedy plaintiffs. *See Power Test Petroleum Distributors, Inc. v. Calcu Gas, Inc.*, 754 F.2d 91, 95 (2d Cir.1985).

Moreover, plaintiffs have adequately demonstrated that this harm extends not only to those areas in which they distributed the Yellow Book directory free-of-charge, but also those regions in which advertising is solicited. The sale of advertising in the Yellow Book directories is virtually the sole source of plaintiffs' revenues, therefore, injury to plaintiffs necessarily reaches to areas in which their advertisers are located. Plaintiffs solicit advertising not only from local businesses, but also from businesses operating on a regional or national basis. (Antik Aff. at 5–6.) Indeed, advertising to the so-called "National Accounts" exceeded $1 million per year for the past four years. (Antik Aff. at 5–6.) Moreover, a review of the Yellow Book Business to Business Yellow Pages directory reveals that many of the Yellow Book display advertisers have businesses located throughout the greater metropolitan area, including northern New Jersey and Fairfield County, Connecticut. (Plfs.' Hearing Ex. 2.) This evidence demonstrates that plaintiffs have achieved market penetration in these areas.

In light of the foregoing discussion, plaintiffs are entitled to the preliminary injunction they seek and the same is hereby granted to them. Defendants are enjoined from using plaintiffs' trademark Yellow Book, or any confusingly similar, word, words or phrase in connection with any classified directory service or related product in the greater New York metropolitan area, including the New York counties of Nassau, Suffolk, Kings, Queens, New York, and Westchester, and the Florida counties of Broward, Palm Beach, Dade, Martin, and Indian River. Defendants are further directed to notify the telephone company not to connect to their telephone any call placed to the number 1–800–935–5692 (1–800–YELLOW BOOK) that has originated from area codes 516, 718, 212, 914, 203, 201, 908, 407, and 305, pending the outcome of this litigation. Pursuant to Fed.R.Civ.P. 65, plaintiffs are directed to post a bond on or before February 1, 1993, in the amount of $100,000 to insure the permanency of the injunction pending an ultimate trial on the merits, if one proves necessary.

SO ORDERED.