HELENE CURTIS, Plaintiff,

v.

NATIONAL WHOLESALE LIQUIDATORS, INC., Defendant.

No. 95–CV–666 (DRH).

United States District Court, E.D. New York.

March 13, 1995.

---

James T. Reynolds, Reynolds, Caronia &
Gianelli, Hauppauge, NY, and James R.
Phelps, Hyman, Phelps & McNamara, P.C.,
Washington, DC, for plaintiff.

Gerard F. Dunne, Gerard F. Dunne, P.C., New York City, for defendant.

## MEMORANDUM & ORDER

HURLEY, District Judge.

In the above-referenced action, Plaintiff Helene Curtis, Inc. alleges that Defendant National Wholesale Liquidators, Inc. has violated certain provisions of the Lanham and Tariff Acts by offering for sale certain "gray market goods." Gray market goods are "goods made by a foreign manufacturer, 'legitimately sold abroad under a particular trademark[,] . . . imported into the United States and sold in competition with goods of the owner of [the United States] trademark rights in the identical mark.'" *Dial Corp. v. Encina Corp.*, 643 F.Supp. 951, 952 (S.D.Fla. 1986) (quoting *Vivitar Corp. v. United States*, 761 F.2d 1552, 1555 (Fed.Cir.1985), *cert. denied*, 474 U.S. 1055, 106 S.Ct. 791, 88 L.Ed.2d 769 (1986)). Currently before this Court is Plaintiff's motion for a preliminary injunction enjoining Defendant from the distribution or sale of such goods through its retail stores in the United States. For the reasons set forth below, Plaintiff's motion is granted.

### Background

Plaintiff Helene Curtis, Inc. is the exclusive owner of the United States trademark for certain "Finesse" hair-care products. (Wentz Decl. at ¶ 3; Not.Mot.Ex. C1.) Plaintiff has manufactured, distributed, and sold Finesse products in the United States since 1982. (Pl.Mem. at 2.) In March, 1984, Plaintiff licensed Helene Curtis, Ltd., a Canadian corporation (hereinafter "Helene Curtis Canada"), to manufacture, distribute, and sell in Canada hair-care products bearing the Finesse trademark. (License Agmt. at ¶ 1.)

Since May, 1990, Defendant National Wholesale Liquidators, Inc., a wholesale distributor and operator of retail stores, purchased Finesse products from Plaintiff and sold such products in its retail stores in the United States. (Pl.Mem. at 5.) In January, 1995, however, Plaintiff learned that Defendant would no longer purchase Finesse products from Plaintiff, for Defendant had acquired Finesse products manufactured by Helene Curtis Canada (hereinafter "Canadian products"[1]) for sale in its retail stores in the United States. (*Id.*) On February 21, 1995, Plaintiff brought on by order to show cause a motion seeking to enjoin Defendant from distributing the Canadian products in the United States. On February 23, 1995, this Court entered a temporary restraining order against Defendant, enjoining Defendant from distributing or selling in the United States any aerosol products manufactured by Helene Curtis Canada. On March 3, 1995, the Court conducted a hearing with regard to Plaintiff's motion for a preliminary injunction.[2]

### Discussion

#### I. Findings of Fact

The following constitutes the Court's findings of fact with regard to the testimony and exhibits that were received in evidence at the preliminary injunction hearing.

#### A. Product Design and Development

Dr. Norman Meltzer, Plaintiff's Corporate Director of Product Integrity, began his testimony with a description of the general process of product design and development. Dr. Meltzer explained that prior to the acceptance of a particular formula for each of its products, Plaintiff spends millions of dollars to determine whether the product will be satisfactory to the intended consumer.

Specifications are developed for all products, and during the manufacturing process, the products are subjected to a rigorous system of quality control "so that when [Plaintiff] make[s] batches of that formula, they will be reproducible and [Plaintiff] will make the same product every time." (Tr. at 6.)

---

1. Although the Court recognizes that certain of the products sold by Helene Curtis Canada are actually manufactured in the United States (Pl. Feb. 21, 1995 Letter at 2 n. 1), the term "Canadian products" is utilized for ease of reference.

2. Defendant consented to extend the duration of the temporary restraining order pending resolution of Plaintiff's motion for a preliminary injunction. *See* Fed.R.Civ.P. 65(b).

Any potential changes to the formula of a particular product are carefully reviewed to ensure that the essential characteristics of the product will not be compromised, and any new formulas are tested with consumer groups to determine their marketability.

Dr. Meltzer and his staff are also responsible for approval of product labeling, including, for example, graphics and ingredient lists. His department also reviews product labels to ensure that they are in compliance with all applicable legal requirements.

Having reviewed the Canadian products offered for sale by Defendant, Dr. Meltzer testified that none of the products would be approved for sale in the United States by his quality control staff.

### B. *Labeling*

Although the characteristics of each of the Canadian products will be discussed separately below, all of the Canadian product labels differ from their United States counterparts in certain respects. First, all of the Canadian products are labeled in French as well as English, while the U.S. products are labeled only in English. Secondly, the quantity of the Canadian products are measured in milliliters, while the U.S. products are measured in ounces. Thirdly, the Canadian product labels, unlike the labels on the U.S. products, do not contain a list of ingredients, as required by federal law.

### C. *Shampoo*

Defendant offered for sale a Canadian shampoo that is labeled as "Daily Treatment Shampoo For Dull or Overstyled Hair." (Pl. Ex. 1a.) Dr. Meltzer identified the two U.S. products that are most similar by way of description: "Regular Shampoo for Normal Hair" (Pl.Ex. 1b), and "Extra Moisturizing Shampoo For Dry Or Overstyled Hair." (Pl. Ex. 1c.) Dr. Meltzer testified that the chemical formulas for these products are not identical. He explained that although all of the products contain conditioners that enable hair to be combed and styled easily, the

Canadian product is not as "highly conditioning" as the U.S. products. (*See* Tr. at 13.) The three shampoos are also dissimilar in their physical appearance: the Canadian shampoo is milky white in appearance; the "Regular Shampoo" is clear with a "blue tinge"; and the "Extra Moisturizing Shampoo" is milky beige in color. (*Id.* at 15.) Finally, the three products are packaged in similar blue plastic bottles, although each bears a different-colored accent stripe.

### D. *After–Shampoo Treatments*

Defendant offered for sale two types of Canadian after-shampoo conditioning treatments. The first is labeled as "Revitalizing Intensive Treatment For Permed or Coloured Hair." (Pl.Ex. 2a.) Dr. Meltzer identified two U.S. products that bear similar descriptions: "Revitalizing Conditioner For Permed Or Color–Treated Hair" (Pl.Ex. 2b), and "Intensive Conditioning Treatment."[3] (Pl.Ex. 2c.) Again, Dr. Meltzer testified that the formulas for these products are not identical, and noted that the three products differ in their texture.[4] (Tr. at 20.) Finally, the products are packaged differently: the Canadian product is packaged in a tube, while the "Revitalizing Conditioner" is packaged in a bottle, and the "Intensive Conditioning Treatment" is packaged in a foil packet. Finally, each of the products bears a different-colored accent stripe.

The second Canadian after-shampoo treatment offered for sale by Defendant is labeled "Extra Moisturizing Conditioner For Dry or Damaged Hair." (Pl.Ex. 3a.) The comparable U.S. product identified by Dr. Meltzer bears a strikingly similar label: "Extra Moisturizing Conditioner For Dry Or Overstyled Hair." (Pl.Ex. 3b.) Dr. Meltzer testified that the formulas of these two products are not identical, and that the viscosities of the product are "somewhat different." (Tr. at 23.) The products are packaged in similar blue bottles, and bear similarly-colored accent stripes.

---

**3.** The label of this product further notes that the product "[c]ontains protein-enriched conditioners, to add strength, shine and resilience to dry, damaged or brittle hair."

**4.** "Texture" apparently refers to the ease with which the product flows. (Tr. at 21.)

### E. *Hair Spray*

Defendant offered for sale three types of Canadian hair spray. The first is an aerosol spray labeled "Regular Hold Hair Spray." (Pl.Ex. 4a–1.) The U.S. product identified as bearing the most similar description is the aerosol "Natural Hold Hair Spray." (Pl.Ex. 4b–2.) Again, Dr. Meltzer testified that the formulas of these products are not identical; and, more specifically, he explained that, unlike the U.S. product, the percentage of Volatile Organic Compounds ("VOCs") in the Canadian product exceeds eighty percent, in violation of the law of certain states. (Tr. at 25.) Finally, although the products are packaged in similar blue canisters, they contain different-colored accent stripes.

The second Canadian aerosol hair spray product offered for sale by Defendant is labeled "Extra Hold Hair Spray." (Pl.Ex. 4a–2.) The comparable U.S. product bears an identical description. (Pl.Ex. 4b–1.) Again, however, the formulas of these two products are not identical, and, unlike the U.S. product, the percentage of VOCs in the Canadian product exceeds eighty percent. (Tr. at 25–26.) The accent stripes on the canisters are also different in color.

Defendant also offered for sale a non-aerosol Canadian hair spray, labeled "Extra Hold Unscented Non-aerosol Hair Spray." (Pl.Ex. 5a.) The comparable U.S. product, which bears a similar description, is labeled "Unscented Extra Hold Hair Spray Non–Aerosol." (Pl.Ex. 5b.) As with the other hair spray products listed above, the formulas are not identical, and the percentage of VOCs in the Canadian product exceeds eighty percent. (Tr. at 26–27.) The products are packaged in similar blue bottles, although the protective covering for the bottle-necks differ greatly in size.

### F. *Spray Gel*

Defendant offered for sale a styling product labeled "Ultimate Control Spray Gel." (Pl.Ex. 6a.) The comparable U.S. product bears an identical name. (Pl.Ex. 6b.) Again, Dr. Meltzer testified that the products do not possess identical formulas. More specifically, he explained that the Canadian product contains more alcohol than the U.S. product, and the amount of alcohol affects the drying characteristics of the product. (Tr. at 27, 29.) Packaging of the products is virtually identical, although the labels bear different-colored accent stripes.

### G. *Mousse*

Defendant also offered for sale a Canadian product labeled as "Regular Control" mousse. (Pl.Ex. 7a.) Dr. Meltzer testified that three U.S. products bearing comparable descriptions are labeled "Bodifying Mousse" (Pl.Ex. 7b), "Moisturizing Mousse" (Pl.Ex. 7c), and "Soft Curls Mousse." (Pl.Ex. 7d.) None of these formulas are identical. All of the mousse varieties are packaged in similar blue canisters, but each product bears a different-colored accent stripe.

### II. *Conclusions of Law*

■ It is well-settled in this Circuit that, to obtain a preliminary injunction, the moving party must demonstrate: (a) that in the absence of injunctive relief, it will suffer irreparable harm; and (b) either (1) a likelihood of success on the merits, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor. *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979). Moreover, a preliminary injunction is an extraordinary remedy not to be routinely granted. *Medical Soc'y v. Toia,* 560 F.2d 535, 538 (2d Cir.1977).

### A. *Likelihood of Success on the Merits*

■ The Court first considers Plaintiff's contention that Defendant's sale of the Canadian goods violates Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1). This Section prohibits the unauthorized sale of goods bearing a registered trademark where there is a likelihood of confusion, mistake, or deception of purchasers.[5] *Original Appala-*

---

**5.** The Section provides, in relevant part, that:
  (1) Any person who shall, without the consent of the registrant—

  (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale,

chian Artworks, Inc. ("OAA") v. Granada Elecs., Inc., 816 F.2d 68, 71 (2d Cir.), cert. denied, 484 U.S. 847, 108 S.Ct. 143, 98 L.Ed.2d 99 (1987). Defendant contends that, in this case, there is no likelihood that consumers will be "confused" by the Canadian products,[6] in that the Canadian products are "genuine" Finesse products.

As a general rule, "trademark law does not reach the sale of genuine goods bearing a true mark even though the sale is not authorized by the mark owner," Polymer Technology Corp. v. Mimran ("Polymer I"), 975 F.2d 58, 61 (2d Cir.1992), as genuine goods do not lead to customer confusion. Because gray market goods are often similar in composition and appearance to their United States counterparts, and because the manufacturer of the gray market goods is often related in some manner to the United States trademark holder, it is often difficult to determine whether such goods are genuine. The Second Circuit has established certain standards, however, for such determinations.

### 1. Quality Control

The Second Circuit has explained that "[o]ne of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark." El Greco Leather Prods. Co. v. Shoe World, Inc., 806 F.2d 392, 395 (2d Cir. 1986) (citation omitted), cert. denied, 484 U.S. 817, 108 S.Ct. 71, 98 L.Ed.2d 34 (1987). Thus, "[g]oods ... that do not meet the trademark owner's quality control standards will not be considered genuine goods, and their sale will constitute trademark infringement," Polymer Technology Corp. v. Mimran ("Polymer II"), 37 F.3d 74, 78 (2d Cir. 1994), for the sale of such goods could mislead consumers into believing that the trademark owner had approved the goods for domestic sale. See OAA, 816 F.2d at 72; see also Societe Des Produits Nestle, S.A. ("Nestle") v. Casa Helvetia, Inc., 982 F.2d 633, 639 (1st Cir.1992) (interpreting a similar section

of the Lanham Act, the court explained that "the use of a mark may be deceptive and, thus, violative of [the Lanham Act], in light of the overall appearance of the package, despite the existence of fine print identifying the true origin; that is, such a package may falsely convey the impression that the domestic mark holder intended the importation of the good into the local market"). For purposes of this standard, "the actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain." El Greco, 806 F.2d at 395.

In this case, Dr. Meltzer testified that his department is responsible for "formula control." (Tr. at 4.) Prior to the acceptance of a particular formula, Plaintiff "spend[s] millions of dollars a year on the testing of the products with consumers to make sure a particular formula meets the niche or is satisfactory to the intended consumer." (Id. at 6.) Moreover, Dr. Meltzer's department monitors the manufacturing process of the U.S. products to ensure that it "is the same every time" (id.); and "during that [manufacturing] process at various stages, tests are run on the batch as it is being manufactured to make sure that it meets the proper specifications that we have set forth." (Id. at 7.) Based upon this testimony, the Court finds that formula control, as well as control over the manufacturing process, are integral parts of Plaintiff's quality control efforts. Because Plaintiff has not been afforded the right to control the product formulas or the manufacturing process of the Canadian goods, Plaintiff has met its burden of proof in establishing that the Canadian goods are not genuine. Cf. Caterpillar, Inc. v. Nationwide Equip., 877 F.Supp. 611, 616 (M.D.1994) (granting injunction where Plaintiff was deprived of quality control, in that "Plaintiff did not oversee the assembly" of the products at issue).

■ Aside from formula and manufacturing control, the Court is persuaded that Plaintiff's lack of quality control is demonstrated by an additional factor: the improper

---

offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive ... shall be liable in a civil action by the registrant....

15 U.S.C. § 1114(1)(a).

6. Defendant apparently does not contest the other requirements of Section 32(1).

labeling of the Canadian products. The labels of the Canadian products do not bear ingredient lists, 21 C.F.R. § 701.3, quantities expressed in fluid ounces, *id.* at § 701.13, or conspicuous country of origin statements. 19 C.F.R. § 134.11. As such, the products are "misbranded," *see* 21 U.S.C. § 362(b) & (c); 15 U.S.C. § 1456, and are subject to seizure. *See* 21 U.S.C. § 334. In contrast, all of the U.S. products comply with the relevant statutes and regulations; and, according to Dr. Meltzer, the improperly-labeled Canadian products would not pass Plaintiff's quality control standards. (Tr. at 35.) Such improper labeling, viewed in conjunction with the evidence regarding the rigorous quality control standards utilized by Plaintiff for its domestic products, demonstrates that the Canadian goods are not genuine. *Compare Polymer II*, 37 F.3d at 78–79. As noted above, *see supra* at 11, the sale of goods that do not meet the trademark owner's quality control standards would likely confuse consumers,[7] and, therefore, such sale constitutes trademark infringement. Plaintiff has thus established a likelihood success on the merits under this standard.

### 2. *Intended for U.S. Sale/Material Differences*

■ The Second Circuit has set forth an additional approach for determining whether gray market goods are genuine. The Second Circuit has explained that the sale of gray goods also violates the Lanham Act if the goods (1) are not intended to be sold in the United States, and (2) are materially different from the authentic goods that are authorized for sale in the U.S. market. *See OAA*, 816 F.2d at 72–73; *Nestle*, 982 F.2d at 638.

Plaintiff has clearly met its burden with respect to the first prong of this test. Plaintiff's licensing agreement with Helene Curtis Canada states that Plaintiff "hereby grants to [Helene Curtis Canada] the right to use [Plaintiff's] trademarks ... on such products ... which [Helene Curtis Canada] will manu-

facture, sell and distribute *in Canada....*" (Licensing Agmt. at ¶ 1 (emphasis added).) Further evidence that the goods were not intended for sale in the U.S. is that none of the Canadian goods comply with federal laws and regulations regarding disclosure of ingredients, and certain of the products fail to comply with state laws regarding Volatile Organic Compounds. As such, Plaintiff has satisfied its burden with respect to the first prong of the test, in that the Canadian goods were not intended to be sold in the United States.

The Court also finds that Plaintiffs have demonstrated a likelihood of success on the second prong of the test. At issue in this prong of the test is whether the Canadian products are "materially different" from the U.S. products.[8] Materiality is, by its very nature, a subjective concept that is difficult to define. *See Nestle*, 982 F.2d at 641. Indeed, it has been stated that "[t]here is no mechanical way to determine the point at which a difference becomes 'material.'" *Id.* The determination of materiality is not, however, without standards; instead, the Court must look to the policies underlying the Lanham Act, as well as the context of the sale of gray market goods.

Initially, the Court considers the policies underlying the Lanham Act. The Act serves two principal functions. First, because "[e]very product is composed of a bundle of special characteristics," and "[t]he consumer who purchases what he believes is the same product expects to receive those special characteristics on every occasion," the Lanham Act strives to protect consumers from confusion and deceit. *Id.* at 636. Secondly, because a trademark owner often shapes its reputation through its product, the Lanham Act seeks to "protect[ ] the trademark owner's goodwill." *Id.*

To protect both of these policies in the context of gray market goods,

---

7. The Court notes that, contrary to Defendant's assertions, Plaintiff need only show that the gray goods are *likely* to cause consumer confusion, and need not prove *actual* confusion. *Nestle*, 982 F.2d at 640.

8. The Court notes that at least one court has suggested that "quality control" is a factor that may be considered in determining whether there are material differences in the gray goods, rather than a separate test for whether the gray goods are genuine. *See Nestle*, 982 F.2d at 642–43.

the existence of *any difference* between the registrant's product and the allegedly infringing gray good *that consumers would likely consider to be relevant when purchasing a product creates a presumption of consumer confusion sufficient to support a Lanham Trade–Mark Act claim.* Any higher threshold would endanger a manufacturer's investment in product goodwill and unduly subject consumers to potential confusion by severing the tie between a manufacturer's protected mark and its associated bundle of traits.

*Id.* at 641 (emphasis added).

Applying this standard to the facts of the case at bar indicates, as will be detailed below, that: (1) "relevant" differences separate the Canadian products from the comparable domestic goods; (2) the resulting presumption of consumer confusion has not been met by any countervailing evidence; and (3) therefore, these differences are "material" for purposes of evaluating Plaintiff's Lanham Act claims.

Attention is now directed specifically to each of the products involved, and the nature and effect of their differences. First, all of the Canadian products differ materially in one respect: their labeling. As noted above, *see supra* at 12–13, the labels do not contain certain information regarding product ingredients and weight as required by federal law. This Court believes that the ingredients of a product are often relevant to consumers in determining whether to purchase a product; and information as to weight in ounces may also be relevant to consumers as they compare prices and quantities of competing products. The Court thus finds that Plaintiff has met its burden of proof in demonstrating that these labeling differences are material, and would likely result in consumer confusion. *Cf. Ferrero U.S.A., Inc. v. Ozak Trading, Inc.,* 753 F.Supp. 1240, 1247 (D.N.J.1991) ("there exists the likelihood of and potential for significant consumer ... confusion

through the sale of a[n imported] ... product that does not conform to the same *labeling* and content specifications" of the comparable domestic goods, where both items bear the same trademark) (emphasis added), *aff'd,* 935 F.2d 1281 (3d Cir.1991); *see also Nestle,* 982 F.2d at 643 (variations in packaging and presentation found to be material).

Secondly, certain of the products also possess material compositional differences.[9] The Canadian shampoo, as compared to the comparable U.S. products, is "not highly conditioning." Conditioning agents provide benefits such as improved "stylability" and "sheen" (Tr. at 13), characteristics that consumers would likely consider to be relevant. As such, Plaintiff has met its burden of proof in demonstrating that the Canadian shampoo is materially different from its U.S. counterparts. *Cf. Nestle,* 982 F.2d at 643–33.

Similarly, the Canadian hair spray products contain material differences in composition, as they differ in their level of Volatile Organic Compounds. Volatile Organic Compounds are apparently monitored by certain states, including California and New York, because they "contribute to smog." (Pl. Feb. 21, 1995 Letter at 2 n. 2.) All of the U.S. hair spray products are clearly labeled with the statement "Meets CA and NY Clean Air Standards." To comply with the Clean Air Standard of at least one of these states,[10] the percentage of Volatile Organic Compounds in the product must not exceed eighty percent. The Canadian products, however, contain a percentage of Volatile Organic Compounds that exceeds eighty percent. This Court finds that the percentage of Volatile Organic Compounds, and its concomitant effect on the environment, is a factor that may be relevant to consumers, whether or not the consumers reside in those states that require compliance with Clean Air Standards.

Finally, the Spray Gel also contains material differences from its U.S. counterpart.

---

**9.** The Court finds that the Canadian shampoo, hair spray, and spray gel are materially different from their U.S. counterparts. Based upon the evidence currently before the Court, however, the Court cannot, at this juncture, find material compositional differences in the Canadian aftershampoo treatments or the Canadian mousse.

**10.** Dr. Meltzer could not conclusively state whether the eighty-percent standard was required by New York or California.

The two products, although bearing identical names, contain different amounts of alcohol. The amount of alcohol in the product "will change the drying characteristics of the spray on the hair and ... will have an effect on the perception of the fragrance." (Tr. at 29.) The Court finds that these differences, which were identified by Dr. Meltzer, may also be relevant to consumers. Therefore, in sum, the Court finds that the Canadian shampoo, hair sprays, and spray gel contain material differences in physical composition from their U.S. counterparts.

Thus, to review the Court's finding with respect to the second prong of this test, the Court finds that all of the Canadian products contain material differences in their labeling, and, further, certain of the products also contain material differences in their physical characteristics. In cases involving gray goods, such as the case at bar, "a material difference between goods simultaneously sold in the same market under the same name creates a presumption of consumer confusion as a matter of law." *Nestle*, 982 F.2d at 640 (citations omitted). Thus, Plaintiff has demonstrated a likelihood of success on the merits, in that the material differences in the Canadian products create a presumption of consumer confusion that has not been rebutted by Defendant.

### B. *Irreparable Harm*

Having determined that Plaintiff has demonstrated a likelihood of success on the merits, the Court proceeds to consider whether, in the absence of injunctive relief, Plaintiff will suffer irreparable harm.

■ The Second Circuit has clearly explained that "[i]n a trademark case, irreparable injury is established where 'there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question.'" *Lobo Enters., Inc. v. Tunnel, Inc.*, 822 F.2d 331, 333 (2d Cir.1987) (citation omitted). Thus, where a plaintiff in a trademark case has demonstrated a likelihood of success on the merits " 'irreparable injury ... almost inevitably follows' and, indeed, is presumed." *Multi–Local Media Corp. v. 800 Yellow Book Inc.*, 813 F.Supp. 199, 205 (E.D.N.Y.1993) (quoting *Omega Importing Corp. v. Petri–Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir.1971)).

■ As demonstrated by the above discussion, under both of the standards set forth by the Second Circuit, Plaintiff has established that consumers are likely to be confused by the Canadian goods. Because such confusion would injure Plaintiff's goodwill, Plaintiff would not be adequately compensated by money damages, and only injunctive relief will provide an adequate remedy.[11] *See id.* (citation omitted). Plaintiff has, therefore, satisfied the second requirement for injunctive relief, that it will suffer irreparable harm.

### III. *Security*

■ At oral argument and in a subsequent letter to the Court, Defendant noted that it would waive the requirement of the posting of a bond under Federal Rule of Civil Procedure 65, in exchange for Plaintiff's waiver of any limitation on damages resulting from a wrongful injunction. (Def. Mar. 6, 1995 Letter at 1–2.) Plaintiff has agreed to such a waiver. (Pl. Mar. 7, 1995 Letter at 1.) Although this Court is aware of authority that suggests that in the absence of a bond, an injured party has no action for damages, *see Continuum Co., Inc. v. Incepts, Inc.*, 873 F.2d 801, 803 (5th Cir.1989) (citations omitted), in light of Plaintiff's waiver of any limi-

---

11. In so holding, the Court rejects Defendant's contention that the appropriate remedy for the trademark infringement is to permit Defendant to relabel the Canadian goods to conform with FDA requirements, rather than to enjoin Defendant from selling the Canadian goods. First, the Court notes that Plaintiff's inability to control the quality of the Canadian goods, as well as the material differences in the composition of certain of the Canadian goods, cannot be rectified by mere relabeling. *Cf. Osawa & Co. v. B & H Photo*, 589 F.Supp. 1163, 1169 (S.D.N.Y.1984). Moreover, in any event, the relabeling of the Canadian products could also irreparably injure Plaintiff's domestic goodwill, in that the packaging and labeling of the comparable domestic products is carefully designed and monitored. *See Clairol Inc. v. Peekskill Thrift Drug Corp.*, 141 U.S.P.Q. (BNA) 147, 151–52, 1964 WL 8130 (N.Y.Sup.Ct.1964).

tation on damages, this Court finds that Plaintiff need not post security in this case.

*Conclusion*

For the foregoing reasons,[12] Plaintiff's motion for a preliminary injunction is granted.

SO ORDERED.

---

12. Because the Court finds that relief is appropriate under Section 32 of the Lanham Act, the Court need not consider Plaintiff's alternative grounds for relief.