**DUNKIN' DONUTS INCORPORATED, et al., Plaintiffs,**

v.

**NATIONAL DONUT RESTAURANTS OF NEW YORK, INC., et al., Defendants**

National Donut Restaurants of New York, Inc., et al., Counterclaim Plaintiffs,

v.

**Allied Domecq, QSR and Allied Domecq PLC, Additional Counterclaim Defendants.**

No. 02–CV–6302(NGG).

United States District Court, E.D. New York.

Oct. 14, 2003.

David E. Worthen, Robert L. Zisk, Schmeltzer, Aptaker & Shepard, P.C., Washington, DC, Ronald D. Degen, O'Rourke & Degen, New York City, for Plaintiffs.

Rachel L. Warren, Davidoff & Malito, New York City, for Defendants.

### MEMORANDUM AND ORDER

GARAUFIS, District Judge.

Plaintiffs Dunkin' Donuts Incorporated ("DD") filed this lawsuit against several of its franchisees (collectively, the "Riese Defendants") on November 27, 2002 alleging trademark infringement, unfair competition, and breach of contract. On February 20, 2003, DD amended its complaint to seek a preliminary injunction ordering the defendants to cease doing business as franchisees of DD. The Riese Defendants have counter-claimed for wrongful termination and breach of the covenant of good faith and fair dealing, and they in turn have cross-moved for a preliminary injunction enjoining DD from terminating the various license agreements.

### Factual Background

In 1985 plaintiffs and defendants entered into a Multiple License Agreement whereby the Riese Defendants were granted the right to develop five Dunkin' Donuts shops in New York City. This Agreement was amended and expanded to cover more stores in 1990 and 1993. Individual franchisees controlled by the Riese organization each operate a separate Dunkin' Donuts location, and each individual franchise agreement runs twenty years from each store's opening. When this lawsuit was commenced the Riese Defendants were operating 19 Dunkin' Donuts stand-alone retail stores, all in New York City, and one centralized kitchen facility in Queens (the "33rd Street Kitchen"), which also had a retail store.

In October and November of 2002 DD inspectors visited all of the Riese stores and found what DD claims were numerous violations of the health and cleanliness standards laid out in the DD–Riese agreements. DD also alleges that the Riese defendants sold Dunkin' Donuts donuts and other bakery products to a competitor

donut chain, Donut Connection, in violation of the agreements. The Riese Defendants argue that the alleged health and cleanliness violations are "trumped up," that the sale of donuts to a competitor did not violate any agreement with DD or was permitted by DD, and that these charges are a pretext for DD's attempt to improperly close Riese's New York City Dunkin' Donut shops so DD can implement a new business strategy.

On July 7, 2003 I began an evidentiary hearing on the cross-motions lasting a total of four days. During the hearing the court heard testimony from a number of witnesses on the following subjects: the extent to which the Riese defendants knew that sales to Donut Connection were unauthorized; the extent to which DD was previously aware of the Riese Defendants' sale of product to Donut Connection [1]; and evidence concerning DD's reaction to the Riese Defendants' claimed refusal to participate in DD's new "Trombo" [2] business strategy. I specifically declined to examine at that hearing any evidence concerning the alleged health and cleanliness violations, because I felt that inquiry into that subject was best suited for trial after full discovery, with the opportunity to cross-examine all of the DD inspectors and others present during the inspections.

**Discussion**

I. Standards for a Preliminary Injunction.

■ "A party seeking injunctive relief must ordinarily show (a) that it will suffer irreparable harm in the absence of an injunction and (b) either (i) a likelihood of success on the merits or (ii) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of the hardships tipping decidedly in the movant's favor." *Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 33 (2d Cir.1995). A movant must, however, meet a higher standard where the injunction is "mandatory" rather than "prohibitive," meaning when it seeks to alter, rather than maintain, the status quo. *See id.* Similarly, the movant must meet a higher standard if the injunction provides the movant with all the relief sought and the effect of the order, once complied with, cannot be undone. *See id.* at 35. Under the higher standard the movant must demonstrate a "clear" or "substantial" likelihood of success, rather than a mere likelihood of success. *See id.* at 34.

■ For DD to obtain a preliminary injunction against the Riese Defendants it must meet the higher standard because it would require Riese to drastically change the character of the stores in question, if not close them altogether. Such an injunction would alter rather than preserve the status quo. Such an injunction would also provide DD with the substantial part of the total relief it seeks, as the ability to operate the Dunkin' Donuts brand in the New York area free of the Riese agreements is arguably far more important to DD than any monetary damages for trademark violation. In addition, money damages would not be sufficient to make the

---

1. Some of the Donut Connection stores to which the Riese Defendants sent DD donuts were Dunkin' Donuts retail locations until approximately February of 2002, when DD terminated its franchise agreement with the owners of these locations and the stores were rebranded as Donut Connection locations.

2. The "Trombo" strategy was a plan by DD to open retail locations with three brands (all owned by defendant Allied Domecq) under one roof, the other brands along with Dunkin' Donuts being Baskin Robbins (ice cream) and Togo's (sandwiches). A "Combo" was an outlet with two of these three brands under one roof.

Riese Defendants whole if the injunction were later lifted after a full trial—the Riese Defendants' Dunkin' Donuts business would be damaged beyond repair, and no amount of money could "undo" the problem. *Cf. Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir.1970) (Friendly, J.).

The Riese Defendants, on the other hand, need only meet the lower standard for a preliminary injunction, because an injunction against DD would be prohibitive not mandatory. The Riese Defendants seek only to preserve the status quo, rather than alter it.

## II. DD's Motion for a Preliminary Injunction

 DD argues that it will automatically suffer irreparable harm if the injunction is not granted, as the unauthorized use of a trademark constitutes a *per se* instance of irreparable harm. "Thus, where a plaintiff in a trademark case has demonstrated a likelihood of success on the merits 'irreparable injury ... almost inevitably follows' and, indeed, is presumed." *Helene Curtis v. National Wholesale Liquidators, Inc.*, 890 F.Supp. 152, 160 (E.D.N.Y.1995). While DD is correct that such unauthorized use constitutes irreparable harm, the question of whether such unauthorized use is actually occurring is at the very heart of this dispute, and the above language is limited to situations where the movant has already demonstrated a likelihood of success. *See id.* There is no doubt that if the Riese Defendants have complied with all of their agreements with DD, then the Riese Defendants' use of the DD trademark has been entirely authorized. And if the trademark use is authorized, DD has not suffered any harm, let alone any irreparable harm. It would be unfair to grant a preliminary injunction like the one DD has requested to a fran-

chisor who simply alleged, without much supporting evidence, that a franchisee had violated its franchise agreement and must be closed immediately. While DD has clearly presented a great deal of credible evidence to support its contentions, the question of irreparable harm in this case cannot be answered without reference to DD's likelihood of success at trial, a subject that is discussed below.

DD also points to the alleged health and safety violations that, if ongoing and publicized, would constitute irreparable harm to the reputation of the DD brand around the country and the world. Such an argument would have more force if DD had brought to the court's attention any attempts it made after the initial round of inspections in October and November of 2002 to ascertain whether the Riese Defendants continued to violate, in DD's view, those health and safety standards. Of late, the Riese Defendants' stores have not been singled out by the press or by any government health department for code violations or negative publicity. Without any timely evidence of such problems or of the Riese Defendants' failure, on an ongoing basis, to meet DD's own health and cleanliness standards, or any evidence that Riese's continued operation of its Dunkin' Donuts stores has somehow cast the brand as a whole in a negative light, I find the risk of irreparable harm to DD for this reason to be slight.

 While DD has produced voluminous and serious pre-trial evidence pointing to violations of the franchise agreements that would justify DD's termination of those agreements, Riese has in turn produced strong rebuttal evidence and explanations that tend to neutralize DD's assertions. In particular, the court heard directly conflicting testimony, especially about the allegedly improper sales to Donut Connection and whether the Riese Defendants

had ever been invited to participate in DD's "Trombo" strategy. For example, with respect to the Donut Connection sales Jamie Galler, Executive Vice President of Operations for the Riese Organization, testified that he received oral permission from two DD representatives, Ayiesha Selwanes and Andrew Wiltshire, for Riese to sell donuts to Donut Connection. Selwanes and Wiltshire deny having ever given Galler such permission. With respect to the "Trombo" strategy, the Riese Defendants' witness Richard Berdugo, a former employee of DD and the liaison between DD and the Riese Defendants at the time of the events in question, testified that DD wanted to "get rid" of the Riese stores so DD could sell exclusive tracts to other franchise operators. Yet Jack Laudermilk, DD's general counsel, testified that the alleged refusal to participate in the "Trombo" plan had no connection to DD's decision to terminate its agreements with the Riese Defendants; rather, that decision was made solely because of DD's consistent failure to meet health and cleanliness standards. The preceding examples are just a small sample of a multitude of situations where the two parties' respective witnesses directly contradict each other. This conflicting testimony prevents the court from finding that DD has a "clear" or "substantial" likelihood of success at a trial.

The court received similar, albeit, limited, contradictory submissions with respect to the alleged health and cleanliness violations. Kazi Alsam, the manager of one of the inspected Riese stores, testified that DD inspector Journana Ramji verbally told Alsam that the store had passed inspection but she must report deficiencies anyway because, as Ramji allegedly said, her boss instructed her that she needed to place evidence of some deficiencies in her report. Ramji denied making any such statement to Alsam or that her boss told her that she must report non-existent deficiencies. Although I did not hear extensive testimony on the health inspections, I have reviewed most of the photographs and find at this time that some of the photographs may support DD's termination of its agreements with the Riese Defendants. However, the relevance of many of the photographs needs to be explained by those involved in the inspections. Thus, on this issue as well, notwithstanding DD's strong evidentiary submissions, I cannot conclude that DD has met the higher standard required in this case of a "clear" or "substantial" likelihood of success at trial.

Accordingly, I find that DD has not demonstrated that it will suffer irreparable harm if an injunction is not granted, nor has DD at this time demonstrated that it has a "clear" or "substantial" likelihood of success at trial. As a result, DD's motion for a preliminary injunction is denied.

### III. Riese Defendants' Cross–Motion for a Preliminary Injunction

As for the Riese Defendants' cross-motion for a preliminary injunction, DD has made clear that it will not engage in self-help in enforcing the termination and will continue to honor the terms of the franchise agreements until a final judicial determination is made. *See* Plaintiffs' Proposed Findings of Fact and Conclusions of Law, ¶ 178. Thus, the Riese Defendants can point to no harm, let alone any irreparable harm, that will result from the failure to grant a preliminary injunction. Nor do I believe that, in light of the conflicting testimony described above, the Riese Defendants are now able to show that they can meet the regular standard of a likelihood of success on the merits. Therefore, the Riese Defendants' cross-motion is also denied.

## Conclusion

For the reasons set out above, plaintiffs' motion for a preliminary injunction is DENIED. Defendants' cross-motion for a preliminary injunction is also DENIED.

SO ORDERED.